**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Frank NADALINE et al., Defendants-
Appellants.**

**No. 72–1431.**

United States Court of Appeals,
Fifth Circuit.

Jan. 3, 1973.

Certiorari Denied April 23, 1973.
See 93 S.Ct. 1924.

Henry J. Whelchel, Miami, Fla., Charles A. Stillman, New York City, for defendants-appellants.

Robert W. Rust, U. S. Atty., Arthur W. Tifford, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before COLEMAN, AINSWORTH and DYER, Circuit Judges.

COLEMAN, Circuit Judge:

Title 18, § 1951(a) of the United States Code [The Hobbs Act, approved June 25, 1948, 62 Stat. 793, as amended] reads as follows:

"§ 1951. Interference with commerce by threats or violence

"(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both."

The two indispensable elements for conviction under this statute are (1) interference with interstate commerce and (2) extortion, Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L. Ed.2d 252 (1960); United States v. Provenzano, 3 Cir., 1964, 334 F.2d 678, cert. denied 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544.

1. The Convictions and Acquittals

The indictment was in seven counts.

Frank Nadaline, Joseph Nadaline, and Lawrence Leroy Smith were found guilty of conspiring to obstruct commerce through extortionate means.

Frank Nadaline and Joseph Nadaline were likewise convicted, as a method of wilfully and knowingly interfering with commerce, of threatening to cause personal harm to John W. Bryan unless the latter agreed not to employ John H. Eggers as a sales representative of Drive-In Cameras, Inc. This offense allegedly occurred on January 20, 1971.

Frank Nadaline and Joseph Nadaline were also convicted of an assault on one John H. Eggers on January 25, 1971, allegedly committed for the same purpose.

Again, as a part of the same course of conduct, for the same purposes, Joseph Nadaline and Lawrence Leroy Smith

were convicted of throwing a rock, on January 25, 1971, through the window of Drive-In Cameras, Inc., at 260 South Federal Highway, Pompano Beach, Florida.

The defendants were thereafter sentenced and the judgment of the District is affirmed.

The same jury returned verdicts of "not guilty" in favor of Frank Nadaline as to two additional counts charging him with similar activity as to one Frances Kivett.

Joseph Nadaline and Lawrence Leroy Smith were found "not guilty", in the same context, of a threat of personal harm against John H. Eggers allegedly committed on January 12, 1971.

## 2. The Background

Frank Nadaline was Chairman of the Board of Harrison Fotochrome, a public corporation with over ten thousand stockholders. Harrison operates photofinishing plants in Denver, Cleveland, New York, and Florida. Joseph Nadaline is Frank Nadaline's son, and manages the professional color division of the corporation. Lawrence Leroy Smith is an employee of Harrison, functioning as a laborer in its Hollywood, Florida, plant.

Among Harrison's competitors in South Florida is Drive-In Cameras, Inc., located chiefly in Fort Lauderdale and Pompano, Florida. Drive-In is partly owned by John W. Bryan. The record shows that it has been and is engaged in interstate and foreign commerce.

John H. Eggers worked at Harrison as a sales representative. As a result of asserted dissatisfaction with the services given the accounts he represented, Eggers resigned his employment on January 11, 1971.

The next day Eggers, the former employee of Harrison, met with Bryan and told him that some of the accounts he represented at Harrison would follow him wherever he went. Realizing the potential of Eggers' services, Bryan hired him.

## 3. The Activities as to Bryan

Eight days later, at about 9:30 A.M., Bryan received a phone call from Frank Nadaline. Nadaline told Bryan:

"I want you to get rid of Jack Eggers. We fired him for stealing. You don't want to hire a thief. I want you to tell me now that you are going to discharge him."

Bryan replied that he would have to think about it. At 11 o'clock that same morning, Frank Nadaline, Joseph Nadaline, and another man came to Bryan's place of business and told him to go into his private office. Frank told his son Joseph to stand outside the office door and not to let anybody use the telephones. Frank and the other man then went into the office with Bryan. The following conversation ensued:

Frank Nadaline (talking to the other man): "You see this guy. You see I want you to work him over."

(To Bryan): "You got five minutes to make up your mind to tell me that you are going to get rid of Eggers."

The other man: "He looks like an intelligent fellow. He don't want to go through all of this for one stinking employee."

One of Bryan's business partners, Mrs. Thomas, had noticed the Nadalines go into Bryan's office and became concerned about the situation. She summoned one of her own employees to go into Bryan's office. Upon being interrupted by the employee, Frank Nadaline decided to leave but not before telling Bryan that he wanted a reply to his request by Friday of that week.

## 4. The Assault of John H. Eggers

On January 25, 1971, Eggers had breakfast at William City Drug Store. Upon leaving the store at about 8:45 A.M., he noticed Frank and Joseph Nadaline standing on either side of his car. Joseph Nadaline told Eggers that he wanted him to come with them. Eggers resisted and was knocked to the ground by Joseph Nadaline. While thus down

Eggers was twice kicked by Frank Nadaline.

Joseph Nadaline admitted the confrontation but said that they only wanted to question Eggers about work stolen from their plant and also about a company car which Eggers had abandoned. He claimed that he hit Eggers in self-defense. He also denied that his father was with him but instead stated that another Harrison employee was there. However, he said that he told the other employee that Eggers was trying to rob him and that is why he hit him. As an explanation for this falsehood he said that the other man was "new" and would not have understood the problems the company was having with Eggers.

Robert Mills, owner of the William City Drug Store, said that Frank Nadaline later admitted to him that he hit Eggers. Frank Nadaline testified that he was at a doctor's office on the morning of the alleged assault, but the doctor's office was only a few minutes drive from the drug store and the doctor testified that he could not have seen Frank until 9:45 or later.

### 5. Breaking a Window of Drive-In Camera

At approximately four o'clock on the morning of January 26, 1971, James Iouna closed the steak house where he worked and met his fiancee out front. The restaurant was located in Pompano, Florida, across the street from a Drive-In camera store. Hearing a crash [a glass window had been broken] Iouna noticed a gold colored automobile parked in front of the camera shop. They also noticed a black male getting in the car and a white male driving. They observed these two men for a couple of minutes before they drove off. Iouna called the police and gave them a description of the men, their car, and their direction of travel. A few moments later a car fitting the description was stopped by the police about seven blocks from the camera store. The occupants of the automobile, Joseph Nadaline and Lawrence Leroy Smith, matched the description of the men Iouna and his fiancee had seen. Explaining their reason for being in the area at the early morning hour, appellants stated that a window at the Harrison plant in Pompano had been broken and they were following a car which had passed by the plant about the time of that occurrence. At another point Smith testified that they were riding around looking for girls.

### 6. Alleged Trial Errors

The appeal raises several issues, to be discussed in the following order:

(1) Sufficiency of the evidence.

(2) Non-disclosure of acquaintance between a trial juror and defense counsel as affecting jury's partiality and the effective assistance of counsel.

(3) Alleged prosecutorial misconduct in the cross-examination of appellant Smith and in the government's summation.

(4) The admission of Smith's prior conviction by way of impeachment.

### 7. Sufficiency of the Evidence

Appellants raise the contention that 18 U.S.C., § 1951 (or The Hobbs Act, as it is more commonly known) is an inappropriate prosecutorial tool in this case and that the evidence was insufficient to meet the requirements of the statute. Appellants argue that even *if true* the assault upon Eggers, the broken window at the camera store, and the visit paid Bryan by the Nadalines only amounted to "fighting back" by one competitor against another *and do not amount to extortion affecting interstate commerce.*

■ The impact of extortion need affect interstate commerce only in a minimal degree, United States v. Hyde, 5 Cir., 1971, 448 F.2d 815, cert. denied 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745.

■■ It has been held that to prove an attempt to extort it is necessary to show an attempt to arouse fear, Carbo v. United States, 9 Cir., 1963, 314 F.2d 718, cert. denied 377 U.S. 953, 84 S.Ct.

1626, 12 L.Ed.2d 498. The threats to Bryan, the breaking of the camera store window, and the assault upon Eggers have all the earmarks of a design to instill fear in both men.

■ Obviously the extortion here involved was concerned with business accounts and with unrealized profits from those accounts. Such intangible property has been held to be included within those rights protected by the Act, United States v. Tropiano, 2 Cir., 1969, 418 F.2d 1069, cert. denied 397 U.S. 1021, 90 S.Ct. 1262, 25 L.Ed.2d 530.

■ Finally, appellants maintain there is no showing that any of the alleged actions were undertaken pursuant to a conspiracy to extort. Conspiracy convictions frequently must depend on circumstantial evidence as indicative of an overall plan.

■ The acts and conduct of the alleged conspirators in this case, coupled with reasonable inferences to be drawn therefrom, left the jury free to conclude beyond a reasonable doubt that an unlawful agreement, express or implied, existed among these defendants, United States v. Jacobs, 5 Cir., 1971, 451 F.2d 530, cert. denied 405 U.S. 955, 92 S.Ct. 1170, 31 L.Ed.2d 231.

8. Non-disclosure of Acquaintance Between a Juror and Defense Counsel

During the jury selection process one juror failed to disclose in response to panel questions from the Court that he knew the *chief defense counsel*, Joseph Varon. This man was later chosen as foreman of the jury. The extent of the relationship was that both men lived in Hollywood, Florida, had known each other for about fifteen years, were never formally in the society of one another, and their meetings had been of a fortuitous nature. Subsequent to the trial, at an evidentiary hearing, the juror stated that this acquaintance had no bearing on his decision in the case.

■ Of course, both the juror and defense counsel should have disclosed that they were acquaintances. However, our appraisal of this record raises no impression that the relationship impaired the appellants' right to a fair and impartial jury. See Roberson v. United States, 5 Cir., 1958, 249 F.2d 737, cert. denied 356 U.S. 919, 78 S.Ct. 704, 2 L.Ed.2d 715.

In *Roberson* one of the jurors was a friend of the prosecuting attorney, the two having had frequent casual contact for a number of years. Defense counsel knew that the juror and prosecutor were acquainted but this fact was never developed during voir dire. Finding no reversible error, we pointed out that a juror is not disqualified per se because he is acquainted with counsel in a case. See, also, Carpintero v. United States, 5 Cir., 1968, 398 F.2d 488.

In the case now before us, defense counsel well knew that he and the prospective juror were acquaintances. He did not call this to the attention of the court. He did not ask the juror about it. He exercised no peremptory challenge against him. Silence reigned supreme—until the unfavorable verdict came in. Then there was a motion for a new trial on this ground. There is nothing of substance in this record to indicate that the failure to disclose an acquaintance between the lawyer and the juror was prompted by prejudice or caused prejudice. Indeed, as already indicated, the jury acquitted all three defendants of various charges.

■ In the absence of a material non-disclosure from which it can be conclusively inferred that prejudice resulted as a matter of law, the party asserting such prejudice has the burden of proof, Brown v. United States, 10 Cir., 1966, 356 F.2d 230; Fabian v. United States, 8 Cir., 1966, 358 F.2d 187, cert. denied 385 U.S. 821, 87 S.Ct. 46, 17 L.Ed.2d 58.

There is no reasonable basis upon which we can allow this episode to reverse these convictions.

■ Appellants argue that the non-disclosure by Varon constituted a denial

of effective assistance of counsel, even in the absence of any showing of actual prejudice.

Such a contention may be well founded where the non-disclosure concerns *a conflict of interest* which could reasonably have a direct bearing on the loyalty of counsel to his client. We are confident that the acquaintance with the juror *did not* affect Mr. Varon's complete and undivided loyalty to his client. The record reveals a dedicated and thorough defense for not only his client, Frank Nadaline, but of all the other appellants as well. Mr. Varon made the only opening statement in behalf of the defense, he cross-examined the government witnesses testifying to counts in which his client was charged, he made numerous objections throughout the trial, he was spokesman for all defense counsel, and he filed the motion for appeal. It simply cannot be said that Varon's representation was perfunctory, in bad faith, or a pretense, Williams v. United States, 5 Cir., 1971, 443 F.2d 1151; Harried v. United States, 1967, 128 U.S.App.D.C. 330, 389 F.2d 281.

### 9. The Alleged Prosecutorial Misconduct

#### a. The Cross-examination of Appellant Smith

██ Smith took the stand in his own defense and denied that he knew about any interference with Raymond Eubanks, a former employee of Harrison. During cross-examination, after again denying having any knowledge of interference with Raymond Eubanks, he was asked the following question: "You didn't know anything about fire being set to his car". Objection was immediately made on the basis that no evidence was introduced to support the question. The appellant never answered and the following then took place:

> "THE COURT: I will sustain the objection and the jury will completely disregard any including of the incident in the question. It is not a part of the evidence in the case and it is not to be considered by the jury in any way.

> "MR. VARON: I think he should be admonished to stay away from something like that.

> "THE COURT: Mr. Tifford, you realize that you are not to include in any questions anything that is not supported by evidence in this case.

> "MR. TIFFORD: I am sorry, Your Honor."

The contention that this admonition was insufficient and that the subsequent motion for mistrial should have been granted cannot, by an overwhelming wealth of commonplace authority, be sustained.

#### b. The Government's Summation

██ Government counsel in his closing argument referred to the alleged assault of Eggers by Frank and Joseph Nadaline. In recounting Robert Mills' testimony, the prosecutor stated that "what Frank Nadaline told him one month after the assault erases all doubt as to the culpability of the defendants in this case". Appellants argue that the government's reference to "defendants" was erroneous since Mills only implicated Frank and Joseph Nadaline and not Smith. The answer to this contention is short. Only the Nadalines were indicted for the assault count and they are unmistakably the individuals to whom the prosecutor was referring.

### 10. The Admission of Smith's Prior Conviction

The appellant Smith took the witness stand in his own defense. On *direct examination* he was asked by his own counsel:

"Q. Are you a violent person?

"A. No, I'm not."

On cross-examination by the United States Attorney the following occurred:

"Q. Now, Mr. Smith, you testified on direct examination further that you are not a violent person. Do you recall your testimony?

"A. I think I recall that.

"Q. Have you ever been convicted of a felony?

"A. Have I ever been convicted of a felony?

"Q. Yes.

"A. Yes.

"Q. You have?

"A. Yes.

"Q. What was the nature of the felony for which you were convicted?

"A. I think they said 'B&E'.

"Q. Breaking and entering?

"A. That's the term, yes sir."

There was no objection to this cross-examination.

This testimony was first challenged on a motion for a new trial in which it was stated, "The Government knew, or should have known, that back in 1958 when this defendant was convicted of a crime of breaking and entering, which is a felony conviction, the said conviction was procured in the Criminal Court of Record, in and for Dade County, Florida, without benefit or assistance of counsel. This cross-examination by the Assistant United States Attorney was offered solely for its general tendency to discredit the character of Lawrence Leroy Smith and operated not only to this defendant but also to the other defendants jointly tried with him".

Attached to the motion was a certificate of the Clerk of the Dade County Criminal Court of Record "that an examination of the file and records in the above case, wherein the defendant was convicted of breaking and entering and sentenced April 16, 1957, to serve one year in the State Penitentiary, discloses that at no stage in the proceedings was the said Lawrence Leroy Smith represented by counsel".

The certificate said nothing about indigency or waiver of counsel.

There was no evidentiary hearing in the District Court and the motion for a new trial was denied without any finding of fact with reference thereto.

A Judge of this Court subsequently allowed Smith "to supplement the record" on appeal with an affidavit from Smith that he was not advised of his right to counsel, that he did not have the money with which to employ counsel, and that he did not voluntarily waive his rights to counsel at the time of the 1957 conviction.

The applicable law is discussed in the decision rendered by the Supreme Court in Loper v. Beto, 405 U.S. 473, 92 S.Ct. 1014, 31 L.Ed.2d 374 (1972). In that case, four Justices concurred in an opinion dealing solely with the following constitutional question: "Does the use of prior, void convictions for impeachment purposes deprive a criminal defendant of due process of law where their use might well have influenced the outcome of the case?".

Four Justices answered the question in the affirmative. For various reasons, four Justices disagreed. One Justice concurred in the result, saying that the lower court should find whether the prior convictions were legally infirm for lack of counsel or failure to waive counsel, or whether there was harmless error.

The four plurality Justices were careful to note [Footnote 11] that "This is not a case where the record of a prior conviction was used for the purpose of directly rebutting a specific false statement made from the witness stand".

We are not left to ignore the care with which the plurality opinion made this notation, citing Walker v. Follette, 2 Cir., 1971, 443 F.2d 167, and other cases which were discussed in *Walker*.

In Walker v. Follette, the defendant testified *on direct examination* that he had never been convicted of a crime. On cross-examination, the prosecution elicited from him the fact that he had suffered prior convictions. It was held that this did not deprive Walker of a fair trial, even if the convictions were invalid for lack of legal representation.

The *Walker* court reasoned, "If a defendant testifies, he puts his credibility in issue. If he lies in the course of his testimony, he lays himself open to attack by means of illegal evidence which otherwise the prosecution could not use against him".

In the light of the foregoing, we construe *Loper* to stand for the proposition that "where their use might well have influenced the outcome of the case", defendants must not have been impeached by reference to convictions obtained in violation of the right to counsel, but this rule does not apply if the impeachment is justified by specifically false testimony given while on the witness stand.

Here, Smith, testifying in his own behalf, swore that he was not a violent person. It turned out to be a fact that he had been convicted of breaking and entering, an activity inconsistent with peaceful conduct.

Moreover, it seems clear to us that the proof of the prior conviction did not influence the outcome of the case. Both Smith and his co-defendants were acquitted of other charges laid against them in the indictment. This fact must also be taken into consideration in the evaluation of the other claims of prejudicial error already discussed.

### Conclusion

The convictions of Frank Nadaline, Joseph Nadaline, and Lawrence Leroy Smith are, in all respects,

Affirmed.