UNITED STATES of America, Appellee,

v.

John D. FRAZIER, Appellant.

No. 77–1195.

United States Court of Appeals,
Eighth Circuit.

Submitted June 14, 1977.

Decided Aug. 5, 1977.

Rehearing and Rehearing En Banc
Denied Aug. 29, 1977.

Leonard J. Frankel (argued), and Richard S. McConnell, Jr., Clayton, Mo., on brief, for appellant.

Richard E. Coughlin, Asst. U. S. Atty. (argued), and Barry A. Short, U. S. Atty., St. Louis, Mo., on brief, for appellee.

Before LAY and ROSS, Circuit Judges, and MILLER, Judge.*

ROSS, Circuit Judge.

Defendant-appellant John D. Frazier (herein either defendant or Frazier) was convicted and sentenced in district court on a one count indictment for attempted extortion of bank assets in violation of the Hobbs Act, 18 U.S.C. § 1951. For the reasons stated herein, we affirm.

So far as they are material to this appeal, the facts may be briefly stated.[1] Through a series of telephone calls defendant proposed to one James Clayton a scheme to obtain money from the First National Bank in St. Louis, Missouri, through its president Clarence Barksdale. The plan called for Clayton to attach to the person of Barksdale what appeared to be an explosive belt, safe removal of the belt being contingent upon payment of a substantial sum of money. The belt would be chained to Barksdale, who would also be given a walkie-talkie so the defendant could monitor his movements.

After receiving the first telephone call from the defendant on November 24, 1975, Clayton contacted the FBI, which immediately began an investigation. Clayton agreed to cooperate with the FBI by feigning compliance with the requests of the defendant. On December 1, 1975, the explosive belt, which had been made by defendant sometime prior, was delivered to Clayton with instructions that the scheme was to be carried out the following morning. With the aid of Clayton, and using an FBI agent as a stand-in for Barksdale, the plot was acted out. Clayton attached the belt to the person of the FBI agent as he left the Barksdale residence on the morning of December 2d. Later that morning the defendant telephoned Barksdale's office at the bank. This call was received by another FBI agent representing himself to be Barksdale. The defendant gave instructions to take $150,000 to the parking lot of Lambert International Airport. One hundred five dollars in currency was placed at the top of bank bags stuffed with paper and taken to the designated location.

Although the agents planned to arrest Frazier at the airport when he came to pick up the money, no pickup attempt was ever made. Two agents then sought to procure an arrest warrant, while others were instructed to arrest Frazier wherever he might be found. From a helicopter, Frazier

---

* JACK R. MILLER, Judge, United States Court of Customs and Patent Appeals, sitting by designation.

1. This case was previously before this court on the government's appeal from the district court's order sustaining defendant's motion to suppress the introduction of certain evidence obtained as a result of attaching an electronic tracking device to defendant's automobile. The facts are more fully set out in that opinion, reported at *United States v. Frazier,* 538 F.2d 1322 (8th Cir. 1976), *cert. denied,* 431 U.S. 926, 97 U.S. 2204, 53 L.Ed.2d 241 (1977).

was located in O'Fallon, Missouri, and was arrested without a warrant as he exited a telephone booth. Frazier was then driven to his home, some ten miles distant, in one of the agent's cars. While in custody, Frazier signed two handwritten consent forms; one giving permission to search his automobile and the other to search his home. Frazier's wife also signed a form giving consent to search the home.

At trial, the court overruled defense objections to the admission of evidence seized during the search of Frazier's automobile and residence, and also denied defendant's motions for judgment of acquittal made at the close of the government's case and again at the close of all the evidence. Defendant's appeal raises essentially four issues with respect to these rulings. The first three deal with the sufficiency of the government's evidence to establish a violation of the Hobbs Act. Lastly, defendant asserts violations of his fourth amendment rights.

## I

### FAILURE TO PROVE RACKETEERING

█ Defendant contends at the outset that his activities do not fall within the perimeters of the Hobbs Act, urging that the Act applies only to "racketeering" and that his scheme did not amount to a racket.[2] This position has found some support in other circuits. *See United States v. Culbert*, 548 F.2d 1355, 1357 (9th Cir. 1977); *United States v. Yokley*, 542 F.2d 300, 304 (6th Cir. 1976). However, this court has consistently maintained that the Hobbs Act means what it says. By its terms § 1951 applies to:

(a) *Whoever in any way or degree* obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do * * *. (Emphasis supplied.)

We are likewise unpersuaded that anything in the legislative history of the Act requires a more restrictive interpretation. In *United States v. Mitchell,* 463 F.2d 187 (8th Cir. 1972), *cert. denied,* 410 U.S. 969, 93 S.Ct. 1449, 35 L.Ed.2d 705 (1973), we said:

When first proposed, the Act was described by its Congressional sponsor in the following terms:

This bill is grounded on the bedrock principle that crime is crime, no matter who commits it; and that robbery is robbery and extortion, extortion, whether or not the perpetrator has a union card. It covers whoever in any way or decree [sic] interferes with interstate foreign commerce by robbery or extortion.

89 Cong.Rec. 3217 (1943) (remarks of Representative Hobbs.) *See also United States v. Green, supra,* [7 Cir.] 246 F.2d [155], at 160. It is our conclusion that § 1951 proscribes all forms of extortion which affect interstate commerce.

*Id.* at 193. In *United States v. Golay,* 560 F.2d 866 (8th Cir. 1977), this court was also confronted with an appeal from a conviction under the Hobbs Act for extortion of bank assets. After carefully reviewing the legislative history, we again concluded that the Act was intended to be given a broad construction to cover all acts of extortion affecting interstate commerce. *Id.,* 560 F.2d at 868. Accordingly, we reject defendant's contention that his acts are beyond the reach of the statute.

## II

### FAILURE TO PROVE ATTEMPT

Defendant next contends that the government's evidence failed to establish two essential elements of the crime of attempted extortion, namely (1) that Frazier attempted to obtain property from his victim, and (2) that Frazier's acts generated fear in bank president Barksdale.

---

**2.** Because we disagree with defendant's interpretation of the scope of the Hobbs Act, we decline to consider whether his activities would otherwise amount to "racketeering."

Extortion is defined in the Hobbs Act, 18 U.S.C. § 1951(b)(2), as follows:[3]

The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

■ On the record before us it is clear that Frazier did not attempt to pick up the money from the airport parking lot before he was arrested. Relying on this fact, defendant points to the statutory language quoted above and argues that the government failed to prove that Frazier attempted to carry out a plan for the "obtaining of property from another."[4] Defendant thus asks this court to find that the term "obtaining of property," as used in the Hobbs Act, means "reducing to actual physical possession." We conclude that it does not carry that meaning. It is well settled that, under the Hobbs Act, it is not necessary to prove that the extortionist himself, either directly or indirectly, received the fruits of his extortion or any benefit therefrom. The gravamen of the offense is loss to the victim. *United States v. Jacobs,* 451 F.2d 530, 535 (5th Cir. 1971), *cert. denied,* 405 U.S. 955, 92 S.Ct. 1170, 31 L.Ed.2d 231 (1972); *United States v. Hyde,* 448 F.2d 815, 843 (5th Cir. 1971), *cert. denied,* 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972); *United States v. Provenzano,* 334 F.2d 678, 686 (3d Cir.), *cert. denied,* 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964). We hold, therefore, that for purposes of the "obtaining of property" requirement, the offense of attempted extortion is complete when the defendant has attempted to induce his victim to part with property.

■ Defendant also asserts the insufficiency of the government's case in that fear generated in Clarence Barksdale was not the inducing cause of the bank bags being delivered to the airport. Defendant thus contends that the state of mind of the victim, i. e. fear, is an essential element of the crime alleged. We express no opinion as to whether the generation of fear in the victim is an essential element of the crime of extortion. It will suffice for present purposes to observe that Frazier was convicted, not of extortion, but of *attempted* extortion. Proof of an attempt to arouse fear is sufficient proof of an attempted extortion under the Hobbs Act. *United States v. Nadaline,* 471 F.2d 340, 343–44 (5th Cir.), *cert. denied,* 411 U.S. 951, 93 S.Ct. 1924, 36 L.Ed.2d 414 (1973); *Carbo v. United States,* 314 F.2d 718, 741 (9th Cir. 1963), *cert. denied,* 377 U.S. 1010, 84 S.Ct. 1902, 12 L.Ed.2d 1058 (1964). In the instant case, the evidence shows that Frazier attempted to induce Clarence Barksdale to surrender bank assets, and to that end directed James Clayton to strap a bomb belt to Barksdale's body accompanied with the threat that the belt would be exploded unless his demands were met. We are satisfied that this is a sufficient showing of an attempt to arouse fear to allow the case to go to the jury.

### III

### DEFENSE OF LEGAL IMPOSSIBILITY

Defendant contends that even if his acts would otherwise have constituted attempted extortion, they are not punishable as such because the early intervention of the FBI and the cooperation therewith of his assumed confederate Clayton rendered it legally impossible for Frazier to accomplish his illegal aim.

A criminal attempt represents the unsuccessful prosecution of an intent to commit a crime. The defense of impossibility oper-

---

3. "Attempted extortion" is not separately defined in the Act.

4. At trial, defense counsel hypothesized in closing argument that Frazier wanted to embarrass the banking community and that his scheme was complete when the money was delivered to the airport. We note, however, that the defendant's motive is irrelevant to the issue we are considering. We decline to decide here whether the evidence produced was sufficient to warrant the jury in finding that Frazier intended to pick up the money. Instead, we consider only whether proof of a scheme designed to induce another to part with money, combined with acts toward completion of the scheme, is sufficient to establish an attempted extortion.

ates with reference to the circumstances which rendered the attempt unsuccessful. Under some circumstances, the impossibility of a defendant's successfully committing a crime eliminates the culpability of his having tried. However, the range of such exonerating circumstances is very limited and does not embrace every instance in which the defendant has undertaken a hopeless venture. To constitute a defense to an attempt prosecution the circumstances must be such as to render successful completion of the crime "legally" impossible. Thus, a distinction is drawn between what is called "legal impossibility," which acts as a defense, and mere "factual impossibility," which does not.

■ Factual impossibility refers to those situations in which a circumstance or condition, unknown to the defendant, renders physically impossible the consummation of his intended criminal conduct. Thus, the oft-recited example of the would-be thief who attempts to pick an empty pocket. *See United States v. Berrigan,* 482 F.2d 171, 188 (3d Cir. 1973); W. LaFave & A. Scott, Criminal Law, § 60 at 440 (1972). *See also United States v. Darnell,* 545 F.2d 595, 597 (8th Cir. 1976), *cert. denied,* 429 U.S. 1104, 97 S.Ct. 1134, 51 L.Ed.2d 556 (1977); *United States v. Heng Awkak Roman,* 356 F.Supp. 434, 438 (S.D.N.Y.), *aff'd,* 484 F.2d 1271 (2d Cir. 1973), *cert. denied,* 415 U.S. 978, 94 S.Ct. 1565, 39 L.Ed.2d 874 (1974); *United States v. Hair,* 356 F.Supp. 339, 341–42 (D.C.1973).

Legal impossibility refers to those situations in which the intended acts, even if successfully carried out, would not amount to a crime. Thus, attempt is not unlawful where success is not a crime, and this is true even though the defendant believes his scheme to be criminal. *United States v. Berrigan, supra,* at 186, 188; W. LaFave & A. Scott, *supra,* at 442.

■ With this distinction in mind, Frazier's assertion of impossibility as a defense must be rejected. Frazier desired to obtain the bank's money from Clarence Barksdale by instilling in him the fear that he would be killed for his refusal. Had Frazier's scheme succeeded, had he brought about the desired consequences, his acts would clearly have amounted to a crime.

Frazier nonetheless insists that his acts are not punishable as an attempt because it was impossible for him to carry his scheme to fruition. This argument should not be taken to mean that the acts of the FBI in thwarting the scheme constitute legal impossibility. If so viewed the argument is plainly misplaced. Indeed, one of the primary aims of the crime of attempt is to provide a basis whereby law enforcement officers may intervene in time to prevent a completed crime.

Reduced to its bare bones, Frazier's claim amounts to the assertion that Clayton, instead of faithfully performing his part of the arrangement, informed the FBI and thereby foiled the scheme. This argument is unpersuasive. Clayton's acts present the type of circumstance, unanticipated by the defendant, which merely render the intended crime physically impossible of consummation. The infidelity of a confederate, like the emptiness of a pocket being picked, presents a simple illustration of factual impossibility.

## IV

## FOURTH AMENDMENT ISSUES

Lastly, defendant asserts error in the trial court's failure to exclude. evidence obtained during the warrantless searches of his automobile and residence.[5]

■ On the record before us, it is clear that with respect to both his automobile and his residence, Frazier gave his consent to the questioned searches. It is also clear that a search conducted pursuant to a valid

---

**5.** Defendant also raises a question concerning the admissibility of articles taken from his person, claiming that the seizure of these articles was the consequence of an unlawful installation on his automobile of a "bumper beeper."

This issue, however, has previously been disposed of by this court and we do not reiterate our position here. *See United States v. Frazier,* 538 F.2d 1322 (8th Cir. 1976), *cert. denied,* 431 U.S. 926, 97 U.S. 2204, 52 L.Ed.2d 241 (1977).

consent is constitutionally permissible. *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The question presented to us, then, is whether the prosecutor discharged his burden of proving that Frazier's consent was freely and voluntarily given. *Schneckloth v. Bustamonte, supra,* at 222, 93 S.Ct. 2041; *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). We conclude that this burden was met.

At the pretrial suppression hearing, FBI agent Kubic testified that on the day of his arrest, Frazier was observed using a public telephone in front of a liquor store on Main Street in O'Fallon, Missouri, at about 3:30 p. m. As Frazier hung up the phone and moved toward his car, agent Kubic, accompanied by agent Fox, approached Frazier and stated: "FBI. Don't move." Frazier was then told that he was being placed under arrest and of the charges against him. From there Frazier was taken to an FBI vehicle a short distance away and provided with an interrogation advice of rights form. Agent Kubic further testified that Frazier expressed a cooperative attitude, saying that there must be some mistake but that he would be glad to help clear up any misunderstanding. Agent Kubic then asked permission to search Frazier's automobile, explaining that if Frazier objected the car would not be searched. Frazier again expressed a desire to help in any way that he could. Agent Fox then prepared a handwritten consent to search form, which Frazier signed. Following the search of his car, Frazier was driven to his residence in the FBI vehicle. While enroute, Frazier gave verbal permission to have his residence searched, and following arrival at his house several minutes later, signed another handwritten consent to search form. Both consent forms were received into evidence without objection.

Agent Kubic's version of the events surrounding the questioned searches was unrebutted by the defendant. Testifying in his own behalf, Frazier stated that he could not remember signing the consent to search forms, but did identify his signature when the forms were shown to him. Frazier further testified that he could not now remember any of the other events that took place that day following his arrest. However, there is no evidence of any kind that Frazier was unaware of what he was doing at the time of his arrest, or at the time he signed the consent forms.[6]

On the record before us we conclude that under "the totality of all the surrounding circumstances," Frazier's consent was "the product of an essentially free and unconstrained choice."[7] *Schneckloth v. Bustamonte, supra,* 412 U.S. at 225, 226, 93 S.Ct. at 2047. The mere fact that the defendant was in custody at the time he gave his consent is insufficient, standing alone, to demonstrate the presence of official coercion. *United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). Accordingly, we hold that the defendant freely and voluntarily consented to the searches of his automobile and residence, and that the searches therefore did not violate his constitutional rights.

AFFIRMED.

6. Following cross examination, the following dialogue took place between Frazier and the court:
THE COURT: Mr. Frazier, were you under the influence of drugs or alcohol or anything else?
A: No, sir, I wasn't, Your Honor.
THE COURT: Have you ever been in a mental institution any time?
A: No, sir, Your Honor.
THE COURT: You just don't remember what happened?
A: No, sir, I do not.
THE COURT: Okay.

7. Elden Marie Frazier, defendant's wife, also signed a consent to search form with respect to defendant's house. Since we have concluded that the defendant's consent was voluntarily given, we needn't consider the validity of Mrs. Frazier's consent.