**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Ronald BELL, Defendant-Appellant.**

No. 86–2340
Summary Calendar.

United States Court of Appeals, Fifth Circuit.

Feb. 25, 1987.

Joe M. Egan, Jr. (Court-appointed) Kerrville, Tex., for defendant-appellant.

Michael R. Hardy, C. Larry Mathews, Jr., Asst. U.S. Attys., Helen M. Eversberg, U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, and GARWOOD and HILL, Circuit Judges.

GARWOOD, Circuit Judge:

Appellant Ronald Bell, convicted by a jury of attempting to extort funds from a bank, challenges the jury verdict and raises two issues in this appeal: (1) that an identification of him by one witness was not credible, and that, without this identification, the evidence does not support his conviction, and (2) that even if this identification is credited, the evidence is insufficient to prove his guilt without attributing to him responsibility for the acts of his accomplice and that such attribution is improper

because it was not authorized by the trial court's charge to the jury. We find no merit in either contention and affirm his conviction.

## I.

About 10:20 a.m. on December 17, 1985, while Mark Haufler was at work in the Charles Schreiner Bank in Kerrville, Texas, his wife, Gaye Haufler, heard a knock at the door connecting her kitchen with the garage. She opened the door and found herself confronted by a man wearing a ski mask and an olive drab fatigue jacket, and holding a gun. He ordered Mrs. Haufler to be quiet, directed her to sit, and handed her a three-by-five-inch index card. Mrs. Haufler testified that the card contained the following message:

"Read this out loud. Do not look at me. You must cooperate. This is not a joke. There is another man actively involved today. If you and your husband do not cooperate, he is our insurance and he will come back and you will both pay."

The card also directed her to call what she believed was a local Kerrville telephone number and to describe the year, color, and model of vehicle her husband drove, then to call her husband at the bank and read him another message. The gist of the message to her husband, on other index cards handed her, instructed Mr. Haufler, an assistant vice-president and loan officer at the bank, not to contact the police, to assemble $100,-000 in unmarked, small-denomination bills within thirty minutes, and then to wait at a pay phone in front of the telephone company building near the bank for further directions.

After Mrs. Haufler made these calls, her hands were bound with a plastic, self-locking electrical cable tie about one foot long. She was ordered into her family's large Chevrolet Suburban wagon, leaving her four-year-old daughter alone in the house, and forced to kneel in the floor well of the passenger seat. Her abductor then drove a short distance to an isolated area in the Texas hill country. There he strapped her to the car with additional cable ties. Mrs.

Haufler, in the seventh or eighth month of pregnancy, was then abandoned.

Back in Kerrville, Mr. Haufler informed his supervisors about the call. Bank officers contacted local police and the Federal Bureau of Investigation (FBI) and began to assemble the funds demanded. Local police quickly established surveillance positions around the telephone company. Mr. Haufler went to the pay phone without the money but accompanied by another bank employee. When the phone rang, Mr. Haufler answered and said he did not have the money together yet. He was told to come back to the same phone with the money but not to have anyone else with him. Mr. Haufler had not mentioned that he had anyone with him, and he realized that he was being watched. Surveillance officers noticed a dark blue pickup truck with dual rear wheels and a door painted a different color than the rest of the vehicle parked at a convenience store with a clear line of sight to the phone.

Mr. Haufler returned in a few minutes with $100,000 drawn from bank funds and received another call, and he was then directed from pay phone to pay phone around town, receiving further instructions from the same caller at each phone, for about an hour, when he finally was directed to go to a scenic overlook point near town and to look for further instructions in a trash can there. Police followed at some distance in three unmarked vehicles, unwilling to use radio communications for fear that they might be overheard if an extortionist had a radio scanner that could receive police broadcasts.

In a trash can at the scenic overlook, Mr. Haufler found a typed three-by-five index card directing him to deposit the money in the trash can and to go back to town and wait at a pay phone for a call telling him where to find his wife. He obeyed these instructions, and the officers who followed him out into the countryside, unaware that he had dropped off the money, followed him back towards town. The officers decided to find out what instructions had been given at the overlook, and stopped Mr. Haufler, only then learning that the

money had been left behind. Officers returned to the scenic overlook, some driving past and one pulling into the parking area. Several officers observed the distinctive dual-wheel pickup stopped at one end of the overlook parking area with one man in the truck's cab. One local officer driving past recognized Allen Bell at the wheel and also saw a man clad in a green fatigue jacket at the end of the scenic lookout parking area some thirty or forty yards from the truck. This officer believed that Allen Bell had recognized him and that Allen knew he was a police officer. Because other vehicles had pulled up near the trash can and departed, the officer who was in the parking area checked the trash can to see if anyone had removed the bag containing the money, but found that it was still there. The man wearing the green fatigue jacket was then seen to approach the dual-wheel vehicle, speak to the driver, and get into the truck. The dual-wheel pickup truck then left the scenic overlook area.

From a distance, one police vehicle followed the truck into town, staying far behind. The officers temporarily lost sight of the truck but soon located it again parked and empty. Shortly afterwards, two men approached and entered the truck, and one officer recognized the man then driving as appellant Ronald Bell and the passenger as his brother, Allen. Officers also determined that the truck was registered to appellant.

Meanwhile, Mr. Haufler continued to wait by the pay phone for news of his wife's location, but no call came, and officers were hesitant to take any action until they were certain Mrs. Haufler was safe. One officer watched the trash can waiting for a possible pick-up. Unbeknownst to everyone, Mrs. Haufler had broken free of her bonds while attempting to shift her position in the Suburban sometime after one o'clock that afternoon. Afraid to leave the vehicle because she thought her abductor might be watching, she waited until dusk, when she walked to a nearby road, flagged down a vehicle, and was given a ride into town. She contacted the police and described the man who had abducted her. One officer realized that the limited description she was able to give (because of the ski mask) was consistent with a description of appellant.

Aware that Mrs. Haufler was safe, police then spotted appellant's dual-wheel truck again, stopped it, and sought appellant's permission to search the vehicle, which he granted. The officers found a toy pistol, a real pistol, two loaded shotguns, a typewriter, two green fatigue jackets, and a bag full of plastic cable ties. Other officers retrieved the money and instruction card from the scenic overlook trash can and the plastic ties from the Suburban.

Further significant evidence at trial linked appellant to the extortion attempt. Mrs. Haufler identified him, in court, as the man she had seen walking by her house the day before she was taken hostage and testified that his eyes matched those of her kidnapper. Evidence was introduced showing that the typewriter found in appellant's truck was his sister's, but that he had kept the typewriter in his house for an extended period before the extortion attempt. Expert laboratory analysts from the FBI testified that all the plastic cable ties found in appellant's truck when he was arrested while in it came from the same manufacturer and some were even from the same mold as those used to bind Mrs. Haufler; that type samples from the typewriter found in the truck on that occasion were consistent with the type on the index card from the scenic overlook; and that blank index cards found in appellant's house were similar to the instruction card in the trash can.

In addition to this physical evidence, one of appellant's friends, Christopher Norris, testified that appellant had described to Norris, following a comment by Norris concerning lack of funds, a highly similar—although not identical—extortion scheme less than three weeks before Mrs. Haufler was seized. Norris had thought appellant was joking when he unveiled his scheme, but said that the scheme as related by appellant required two men and included taking a bank officer's wife hostage, extorting funds by requiring the bank officer to issue a false loan, communicating only with

"three-by-five" index cards containing words cut out of publications and never speaking, wearing a ski mask, and ordering the bank officer to move from pay phone to pay phone to detect any police surveillance.

Additional testimony implicating appellant came from some San Antonio college students who had been returning together from a sorority retreat in a caravan driving down the interstate highway past Kerrville the day before the attempted extortion. After one of the students' vehicles—a pickup truck—had a flat tire near the scenic overlook, three of the students' vehicles stopped, but the women were unable to free the spare tire. The students flagged down a passing dual-wheel truck and were assisted by the two men who were riding in it. The next day, after hearing news reports of the extortion attempt, one student realized the men who had helped change the flat might have been involved, and she contacted the police. Several of these students testified at trial and described a dark blue dual-wheel truck with a door painted a color different from that of the rest of the vehicle, and one testified that the two men looked like brothers. Their testimony reflected that as one man worked underneath the truck to free the spare tire, several typed index cards fell from his pocket. One student, who was watching him work, could read the cards before they were put back into the man's pocket, and she was so disturbed by what she read[1] that she had recorded a description of the truck and its license number (which other evidence showed matched appellant's truck) and told her companions about what she had read on the card. After the tire was changed, she saw the truck drive to the scenic overlook.

The government also produced evidence showing that no significant funds were found on appellant when he was arrested, no money was found in his house, and both of his checking accounts were virtually empty, one containing fifteen cents on the day of the abduction, and the other only four dollars and ten cents. He had already spent all the money he had been paid as a carpenter and contractor, including funds he had received for a project he had not yet completed, and he had no jobs scheduled for the immediate future. In addition, appellant had borrowed funds from his bank and was obligated to make loan payments due later the month of the extortion attempt. Evidence indicated appellant's brother Allen Bell was in a similar financial state and had experienced difficulties in meeting loan payments.

Appellant took the stand in his own defense, and admitted that the cards spotted by the San Antonio student had fallen from his pocket, but claimed that the cards were his brother's and that he had only put them in his pocket because they were blowing around inside the truck cab. He also admitted that he and his brother were present at the scenic overlook point on the day of the abduction at the time officers had testified they saw the Bell brothers there. Appellant testified that he had been walking through the brush alongside the interstate highway that day because his brother was driving his truck and had arranged to pick him up near the interstate. He also stated that he was physically capable of travelling across country on foot a distance equal to that from where the Suburban, with Mrs. Haufler bound in it, had been abandoned, to the scenic overlook, all well within the time which elapsed between the Suburban's abandonment and Mr. Haufler's arrival at the overlook. Appellant offered various explanations for his conduct which the jury plainly chose to disbelieve.

## II.

■ Appellant was convicted of violating the Hobbs Act[2] by attempting to extort

---

1. She testified that she had time to read only the following message from the card: "Do not look at me. You must cooperate. You will not be harmed. You will call your husband and read him this message."

2. The Hobbs Act, 18 U.S.C. § 1951, provides in pertinent part (emphasis added):
   "(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion *or attempts* or conspires so to do, or commits *or*

money from the Kerrville bank. His brother, Allen Bell, was charged with the same offense [3] and pleaded guilty, but refused to testify against appellant at trial.

In his appeal, appellant raises two issues: (1) that the evidence of his guilt was insufficient because of the questionable quality of Mrs. Haufler's identification of him, and (2) that, because the evidence was insufficient to find him guilty as a principal, he was improperly convicted for the acts of his brother without any aiding and abetting instruction having been given to the jury. We address these contentions in turn.

### A. Mrs. Haufler's identification

■ The heart of this contention is that—without Mrs. Haufler's identification of appellant—there is no evidence that he was her abductor.

At trial, Mrs. Haufler identified appellant through a somewhat circuitous method as the man who abducted her. She testified that she recognized the eyes of her abductor through the holes in the ski mask as being the same as those of a man she had seen walking past her house on the street the day before the extortion attempt, a man she said she had focused her attention on because her four-year-old daughter was then playing in the area and because the man looked out of place in her neighborhood. From the witness stand, she then identified appellant as the passing stranger.

Appellant contends that Mrs. Haufler's identification of him is incredible because she made no mention of the passing stranger in any police investigative report and because she claimed to have realized that the stranger was appellant only because she saw a news photo of him when she glanced through her husband's clipping collection shortly before trial some seventy-five days after the extortion attempt. Appellant also points to a conflict between Mrs. Haufler's testimony that she had looked at no photographs of him until she saw the press clipping, and that of an FBI agent who testified that he had showed her a photo lineup that included a picture of appellant.

Appellant also points to inconsistencies between the details of Mrs. Haufler's testi-

threatens physical violence to any person or property *in furtherance of a plan or purpose to do anything in violation of this section* shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

"(b) As used in this section—

"....

"(2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."

Proving "a depletion of the resources of the business ... [by extortion of business funds] permits a reasonable inference" that obstruction of commerce has occurred. *Esperti v. United States*, 406 F.2d 148, 150 (5th Cir.), *cert. denied*, 395 U.S. 938, 89 S.Ct. 2005, 23 L.Ed.2d 458 (1969); *see also United States v. Frazier*, 560 F.2d 884 (8th Cir.1977) (attempt to extort funds from a bank violates Hobbs Act even though funds never reached the extortionist), *cert. denied*, 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978).

3. The indictment, referencing pertinent sections of the Hobbs Act for definitions, charged that Ronald and Allen Bell

"did knowingly, willfully, and unlawfully obstruct, delay and affect commerce ... and the movement of articles and commodities in commerce and did attempt to do so by extortion ... by attempting to obtain property of the value of $100,000 in the form of money, from the Charles Schreiner Bank and its officer, Mark Haufler, which bank was doing business in interstate commerce ..., with their consent, induced by the wrongful use of actual and threatened force, violence, and fear; that is to say:

"(1) The Defendants took as hostage Gay Louise Haufler, who was and is the wife of Mark Haufler, an officer and employee of the Charles Schreiner Bank;

"(2) The Defendants communicated to Mark Haufler that his wife, Gay Louise Haufler, was a hostage and that he was to obtain $100,000 in unmarked small bills and follow their instructions;

"(3) The Defendants instructed Mark Haufler to leave the money at an isolated site;

"all in violation of Title 18, United States Code, Section 1951."

A kidnapping with the purpose of extorting funds from a bank can properly be prosecuted under the Hobbs Act. *See United States v. LaBinia*, 614 F.2d 1207, 1208–10 (9th Cir.), *cert. denied*, 446 U.S. 969, 100 S.Ct. 2951, 64 L.Ed.2d 830 (1980); *see also* Annot., Elements of Offense Proscribed by the Hobbs Act (18 U.S.C. § 1951) Against Racketeering in Interstate or Foreign Commerce, 4 A.L.R.Fed. 881, § 9[d], at 911–913 (1970).

mony and his actual appearance. Mrs. Haufler described her abductor as wearing green jeans and having hazel eyes, dark blond or light brown hair, and a stocky build. Appellant, however, was wearing blue jeans when he was seen later the day of the abduction and when he was arrested that evening, and claims that his eyes are green, that his hair is dark brown, and that he is and was slender.

After careful review of the record, we conclude that no significant irreconcilable inconsistency has been established between the description Mrs. Haufler gave of her abductor and the appearance of appellant on the day of the abduction,[4] and, further, that the jury heard Ronald Bell's argument on this issue in full and made a credibility determination normally not subject to second-guessing through appellate review.[5] Mrs. Haufler's identification of appellant as the passing stranger was subjected to vigorous and detailed cross-examination, and the district court instructed the jury at length on both witness credibility and witness identifications. The jury apparently

concluded either that, even if Mrs. Haufler's identification of appellant as her abductor was unreliable when viewed in isolation, it was not essential to the conviction because of the great weight of other evidence implicating him,[6] or that it was reliable in the context of all the circumstances and served as further evidence against appellant.[7] In either alternative, we discern no justification for reversing appellant's conviction because of his complaints about Mrs. Haufler's identifications of him.

**B. Evidence supporting appellant's conviction as a principal**

Appellant's remaining contention is that in any event the evidence was insufficient to support his conviction unless he is regarded as responsible for the acts of his brother, Allen Bell, and that, because no aiding and abetting instruction was given, he cannot be held responsible for the acts of a coperpetrator.

■■■ Appellant's argument centers on the district court's charge to the jury de-

---

4. We observe that people can change their trousers; that an FBI agent also described Ronald Bell's eyes as "hazel" (which he explained meant—to him—something between brown and green, a color which photographic exhibits indicate is accurate), and that words indicating color, such as "hazel" and "light brown," are inherently subjective and imprecise. We also note that witnesses indicated appellant's hair was somewhat sun-bleached before his arrest, an observation consistent with his exposure to sunlight as a carpenter, subcontractor, and outdoorsman, but that his hair had been cut shorter by the date trial began. Finally, testimony was offered that wearing a fatigue jacket and fatigue trousers over blue jeans might make one appear to be stockier than would other clothing.

5. It is the duty of the jury, and not of the appellate court, to make witness credibility determinations. *United States v. Davis,* 752 F.2d 963, 968 (5th Cir.1985). Ordinarily, a reviewing court cannot declare a witness' testimony "incredible as a matter of law unless 'it is so unbelievable on its face that it defies physical laws.'" *United States v. McKenzie,* 768 F.2d 602, 605 (5th Cir.1985) (citation omitted), *cert. denied,* — U.S. —, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986). Nothing in the present case takes it out of this general rule.

6. We view the record, briefly summarized above, as providing ample direct and circum-

stantial evidence—including appellant's own testimony—to allow a jury to find beyond a reasonable doubt that he participated in the planning and execution of the extortion effort, and that he abducted Mrs. Haufler and traveled cross-country to the drop site while an accomplice maintained contact with Mr. Haufler.

7. We do not view the chain of events leading to Mrs. Haufler's identification of appellant as beyond the bounds of credibility or as plainly impossible. We know of no reason why Mrs. Haufler should have attached special significance to the passing stranger until she saw a picture which made her realize that the man she had seen was appellant. We also observe that appellant had changed his own outward appearance by the time of trial by having his hair cut shorter than his normal style and by shaving off the beard and moustache which he had always worn during most of his years in Kerrville. His own girlfriend, in fact, testified that she had never seen him clean-shaven before trial, and other witnesses indicated that his eyes had seemed especially prominent and memorable before he shaved. We further note that evidence presented during trial inevitably made the jury aware of appellant's alteration of his appearance for trial, and that the jury may have concluded his transformation affected the ability of various witnesses to identify him with certainty as the bearded, moustached Ronald Bell of the past.

scribing the essential elements of the government's proof. The jury was told that the government must prove beyond a reasonable doubt "that the defendant Ronald Bell induced or attempted to induce the Charles Schreiner Bank and Mark Haufler to part with money." Appellant claims that his brother Allen made the critical calls instructing Mr. Haufler to remove the money from the bank and carry it to the scenic overlook, and that appellant cannot be held criminally liable for his brother's acts because the jury was not instructed on accomplice liability. We observe that the government carried a heavier burden in this case by being required to prove to the jury's satisfaction that Ronald was a co-principal in the extortion attempt rather than a mere aider and abettor, and we determine that the government met its burden of proof under that standard.[8]

Appellant's theory depends on an essential premise—that each accomplice in a single offense is responsible only for the specific criminal acts he personally commits—which we view as patently inapplicable to an offense jointly committed by more than one coperpetrator. It is hornbook law that

"[t]here can be more than one principal in the first degree. This occurs when more than one actor participates in the actual commission of the offense. Thus, when one man beats a victim and another shoots him, both may be principals in first degree to murder. And when two persons forge separate parts of the same instrument, they are both principals in the first degree to the forgery.

"Although it has been said that a principal in the first degree must be present at the commission of the offense, this is not literally so. He may be 'constructively' present when some instrument which he left or guided caused the criminal result." W. LaFave & A. Scott, *Criminal Law* § 63, at 497 (West 1972) (footnotes omitted).

*See also* 21 Am.Jur.2d, Criminal Law, §§ 168–169, at 326–28 (1981) (describing principals).[9]

Criminal liability for accomplice actions under the Hobbs Act may arise from an indictment charging multiple defendants under the federal aiding and abetting statute, 18 U.S.C. § 2, *e.g., United States v. Stubbs,* 476 F.2d 626, 627 (6th Cir.1973) (affirming the conviction of defendant Jackson even though others, and not Jackson, made the actionable threats), or on the basis of a conspiracy charge, *e.g., United States v. Nadaline,* 471 F.2d 340 (5th Cir.), *cert. denied,* 411 U.S. 951, 93 S.Ct. 1924, 36 L.Ed.2d 414 (1973). However, a defendant may *also* be punished as one of several principals, each of whom performs only one role in a multi-part scheme to extort money and none of whom executes every step of that scheme. *Cf. Esperti v. United States,* 406 F.2d 148, 149–50 (5th Cir.), *cert. denied,* 395 U.S. 938, 89 S.Ct. 2005, 23 L.Ed.2d 458 (1969) (conviction for substantive offense of defendant Dara, charged under 18 U.S.C. § 1951, affirmed although Dara did not commit every step of the offense). Similarly, a defendant has com-

**8.** We likewise conclude that the district court's failure to give an aiding and abetting instruction (or some other similar instruction) was not plain error. We note that appellant never requested the district court to give an aiding and abetting instruction and that, if it had done so, the jury might have more easily convicted appellant. *See United States v. Schultz,* 769 F.2d 431, 433–32 (7th Cir.1985) (the defendant did not request an aiding and abetting instruction, and the reviewing court concluded that the defendant's failure to request the instruction was a tactical choice; discussing the higher burden of proof on the government when an aiding and abetting instruction is not given, *Schultz* noted the risk that "an aiding and abetting instruction might have only confused or distracted the jury" or "might have actually prejudiced the defendant by suggesting to the jury a possible method

of compromising on the ultimate question of guilt notwithstanding any weaknesses in the government's proof.").

**9.** We observe that the common law classified accomplice liability based on aiding and abetting as being a "principal in the second degree." An aider and abettor is either physically present at the commission of an offense or constructively present, that is "physically absent from the situs of the crime but aids and abets the principal in the first degree at the time of the offense from some distance." W. LaFave & A. Scott, *supra,* § 63, at 497–98. In the instant case, in contrast, each accomplice, acting in concert, committed part of a single offense which occurred only through their joint action.

mitted the offense of attempting to extort funds even if the defendant's acts are unsuccessful, so long as they constitute an effort to extort funds by threats or fear. *See United States v. Frazier*, 560 F.2d 884, 887 (8th Cir.1977), *cert. denied*, 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978) ("Proof of an attempt to arouse fear is sufficient proof of an attempted extortion under the Hobbs Act."; citing cases).

The acts which the evidence indicates appellant committed—planning the crime, taking Mrs. Haufler hostage and compelling her to call her husband, instructing him to assemble $100,000 (which evidence showed Mr. Haufler had to remove from bank funds because he could not reasonably have been expected to gather this amount of money from his own resources), thereby starting the scheme in motion, and ensuring that Mrs. Haufler remained restrained while the delivery of funds was being arranged—make him fully culpable as a principal in the crime charged.[10] *Frazier, supra*, at 887. As we read the language of the Hobbs Act, *see supra* note 2, appellant became a principal by pointing a weapon at Mrs. Haufler—one she believed was real—because he thereby "threaten[ed] physical violence … in furtherance of a plan" to extort money. That act alone violated the statute, and his other actions were further attempts to "obstruct[ ], delay[ ], or affect[ ] commerce" in violation of the Act. Plainly, the jury could conclude that appellant "attempted to induce" the bank and Mr. Haufler to part with money.

Although the extortion offense involved all events from the moment Mrs. Haufler was taken hostage until Mr. Haufler deposited the extorted funds in the location designated by the extortionists, we decline to carve the defendants' extortion scheme into discrete subparts and to absolve any male-factor who was not physically present at every misdeed. Just as, in the crime of armed bank robbery, the getaway driver and robber holding only a canvas sack are generally joint principals along with the robber carrying the firearm, the hostageholder and his colleague in contact with the bank officer were jointly principals in this extortion attempt. We reject appellant's second complaint on appeal.

### III.

Finally, we observe that evidence of appellant's role in this crime was more than adequate to support the jury verdict. In weighing the evidence under an insufficiency claim, we view the evidence as a whole and the inferences that can be drawn therefrom, and generally accept all credibility determinations, in the light most favorable to the jury verdict. *United States v. Saenz*, 747 F.2d 930, 935, 936 (5th Cir. 1984), *cert. denied*, 473 U.S. 906, 105 S.Ct. 3531, 87 L.Ed.2d 655 (1985).

"It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of the evidence." *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (en banc) (footnote omitted), *aff'd on other grounds*, [462 U.S. 356] 103 S.Ct. 2398 [76 L.Ed.2d 638] (1983).

As the facts set forth above make clear, the jury could properly have found appellant guilty of this offense beyond a reasonable doubt.

Accordingly, we affirm the conviction.
AFFIRMED.

---

10. *Cf. United States v. Schultz*, 769 F.2d 431, 432–34 (7th Cir.1985) (defendant Schultz, who did not hold a gun during bank robbery, contended he could not be convicted of robbery using a dangerous weapon without an aiding and abetting instruction; Schultz' conviction as a principal was affirmed); *United States v. Wilkins*, 659 F.2d 769, 773 (7th Cir.1981) ("the driver of a getaway car is a principal in the crime and not a mere accomplice after the fact"; citing *United States v. Willis*, 559 F.2d 443, 444 (5th Cir.1977)), *cert. denied*, 454 U.S. 1102, 102 S.Ct. 681, 70 L.Ed.2d 646 (1981); *United States v. Marx*, 485 F.2d 1179, 1185 (10th Cir.1973) ("Shriver and Marx were charged as principals in the indictment because the acts of Marx in brandishing the pistol were as a matter of law the acts of Shriver."), *cert. denied*, 416 U.S. 986, 94 S.Ct. 2391, 40 L.Ed.2d 764 (1974).