**UNITED STATES of America, Appellee,**

v.

**George Joseph SANTONI, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**John Jake Konstantine JAKUBIK, Appellant.**

**Nos. 77–2006, 77–2007.**

United States Court of Appeals, Fourth Circuit.

Argued July 17, 1978.

Decided Oct. 19, 1978.

Harold I. Glaser, Baltimore, Md., for appellant in No. 77–2006.

M. Albert Figinski, Baltimore, Md., for appellant in No. 77–2007.

David Dart Queen, Asst. U. S. Atty., Baltimore, Md. (Russell T. Baker, Jr., U. S. Atty., Baltimore, Md., on brief), for appellee.

Before BOREMAN and FIELD, Senior Circuit Judges, and HALL, Circuit Judge.

FIELD, Senior Circuit Judge:

George Santoni and John Jakubik appeal from their convictions under 18 U.S.C. § 1951 (Hobbs Act),[1] following a joint jury trial. The appellants were joined under Rule 8(b) of the Federal Rules of Criminal Procedure and charged in a multicount indictment. Santoni was charged with violating 18 U.S.C. § 1951 (extortion) and § 2 (aiding and abetting) in Counts One through Four and with violating 26 U.S.C. § 7206(1) (tax evasion) in Count Five; he was convicted on Counts One through Four and acquitted on Count Five. Jakubik was charged with violating 18 U.S.C. §§ 1951 and 2 in Counts Two and Three; he was convicted on Count Two and acquitted on Count Three. Both Santoni and Jakubik appeal, contending that there was an insufficient nexus with interstate commerce to support a conviction under the Hobbs Act. In addition, Jakubik argues that (1) "property" was not extorted within the meaning of the Hobbs Act, (2) it was reversible error for the trial court to deny his pre-trial motion for severance based on improper joinder under Rule 8(b), and (3) it was reversible error for the trial court to deny his Rule 14 motion for severance when only one day before the end of their joint trial Santoni stated that he would not take the witness stand.

---

[1] 18 U.S.C. § 1951 reads in pertinent part as follows:

(a) Whoever in any way or degree. obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—

* * * * * *

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

(3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

This case centers around the federal government's attempt to uncover in the city of Baltimore a practice under which contractors were required to kick back a percentage of their contract fees to various officials in exchange for assurances of future contracts and the evasion of inspections during the performance of their contracts. As a part of this investigation, Municipal Chemical Corp. was organized in February, 1975, with the financial support of the F.B.I., for the specific purpose of obtaining evidence relative to political kickbacks and extortion incident to local government contracts in Baltimore. Although the realization of profit was not a primary goal of Municipal Chemical, the corporation was designed to acquire and perform contracts in the field of chemical cleaning and building demolition while pursuing its undercover activity. Salvatore Spinnato was hired to work in cooperation with the F.B.I. as a paid consultant to Municipal Chemical, and was the only person in the corporation familiar with chemical cleaning. F.B.I. agents Dudley Hodgson and Ronald Miller acted as officers of Municipal Chemical. During the period covered by the indictment, appellant Santoni was a member of the Maryland House of Delegates and had been assisted in his election effort by appellant Jakubik who was a building maintenance foreman for the city of Baltimore.

In May of 1975, Olympos Painting Co. acquired a contract to clean two public schools in the Baltimore area. Later in that spring Spinnato informed Santoni, whom he had known previously, that he was involved with Municipal Chemical and that it had bid unsuccessfully on the cleaning contract awarded to Olympos Painting. Santoni informed Spinnato that he could help Municipal Chemical but that it would cost ten percent of all contract fees plus an initiation fee of $3,000. Spinnato paid Santoni the $3,000, and Santoni advised him that he could obtain a subcontract for Municipal Chemical from Olympos Painting. Jakubik arranged for a meeting between Santoni and Konstantinos Nicolaidis, president of Olympos Painting, at which meeting Santoni was introduced by Jakubik, according to Nicolaidis' testimony, as "a state delegate [who] can help you if you ever have a problem * * *. And it is good to have a friend like this * * * on account of [Santoni's] being a politician and state delegate." At this meeting Santoni requested that Olympos Painting give Municipal Chemical a subcontract to clean one of the two Baltimore schools, but Nicolaidis was reluctant to enter into such an arrangement.

At a subsequent meeting Santoni, Jakubik, Spinnato, Hodgson, Miller and Nicolaidis discussed the possibility of a subcontract for Municipal. After Nicolaidis refused Municipal Chemical's offer to perform the work for $32,000, according to Nicolaidis' testimony, Jakubik reminded Nicolaidis "about he knowing people, that they can help contractors, that it's good to have these people as friends, and sometimes you couldn't afford to have them against you." During this same meeting, Santoni informed Nicolaidis that there would be no trouble with inspectors. Nicolaidis subsequently agreed to award the subcontract to Municipal Chemical at the price of $16,000 because, according to his testimony, "I thought I was getting into or associating with people that would be helping me in future contracts." On July 21, 1975, after signing and delivering the subcontract to Nicolaidis, the principals of Municipal Chemical paid Santoni $1,600 to cover the ten percent kickback fee.

In the performance of its subcontract, Municipal Chemical used Hydron 300, a chemical manufactured in Pennsylvania, as expressly required by the original contract. In addition Municipal Chemical rented power scaffolding and accessories from Sky-Climber, Inc., of California. After completing its work under the subcontract, Municipal Chemical sold 55 gallons of Hydron 300 to Nicolaidis for use by Olympos Painting in completion of the contract.

About the time the school subcontract was being completed, Santoni informed Spinnato that it would cost Municipal Chemical $10,000 for his assistance in the

acquisition of demolition contracts, and agent Hodgson paid Santoni the amount requested by him. In February of 1976, approximately one year after its formation, Municipal Chemical Corp. was forced to terminate its operations because Spinnato's undercover activity had been revealed.

## INTERSTATE COMMERCE

Counts One through Three were based upon the chemical cleaning contract and subcontract while Count Four involved the attempt to acquire demolition contracts. With respect to the chemical cleaning contract and subcontracts, appellants argue that (1) the government created the only connection with interstate commerce and thus manufactured the jurisdictional requirement, and (2) Municipal Chemical was only a "one shot deal" and thus there was no real effect on interstate commerce as a result of appellants' activities. We do not agree and conclude that the requisite nexus with interstate commerce under the Hobbs Act was established in Counts One through Three.

Appellants contend that Municipal Chemical, the government created corporation, provided the only connection with interstate commerce by making purchases of Hydron 300 and renting scaffolding, both of which were manufactured out-of-state. They argue that the logical extension of holding that the interstate commerce jurisdictional element was met in such fashion would permit the government to assume federal jurisdiction over purely state criminal cases by manufacturing a nexus with interstate commerce. In making this argument the appellants rely strongly on *United States v. Archer*, 486 F.2d 670 (2 Cir. 1973), which involved 18 U.S.C. § 1952 (Travel Act), making it a federal crime to use any facility in interstate commerce to carry on an illegal activity. In *Archer* the only connection with interstate commerce consisted of interstate phone calls initiated by a government agent for the express purpose of creating jurisdiction, with the exception of one transcontinental call which the court discarded as " 'a casual and incidental occurrence.' "

*Id.* at 682. The Second Circuit expressed its disapproval of the government's methods of uncovering the illegal activity and its attempts to create jurisdiction. While the conviction was reversed, upon rehearing the court narrowed its holding to those cases where the interstate commerce element "is furnished solely by undercover agents." *Id.* at 685–86. The Second Circuit's subsequent decision in *United States v. Gambino,* 566 F.2d 414 (1977), appears to further restrict *Archer.* In *Gambino* the F.B.I. had organized a sanitation collection company in an effort to uncover extortionate pressure being placed on similar companies by the defendants. The only connection with interstate commerce was the government's out-of-state purchases of equipment, and dumping of garbage in New Jersey because of cheaper rates. The court distinguished *Archer* by noting that it involved the contrived use of interstate facilities whereas in *Gambino* "the activities of [the government corporation] were *necessarily* wedded to interstate commerce." 566 F.2d at 419 (emphasis added). In our opinion the present case is distinguishable from *Archer* and falls within the rationale of *Gambino* since the contract with the city *required* the use of Hydron 300. Regardless of who performed the work on the two Baltimore schools, interstate commerce would have been involved in the cleaning process by this required use of Hydron 300. In addition the rented scaffolding, manufactured out-of-state, was a *necessary* part of the cleaning process. Appellants' reliance on *Archer* is further undercut by our decision in *United States v. LeFaivre,* 507 F.2d 1288 (4 Cir. 1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975), where we concluded that the interstate requisite of the Travel Act is satisfied if there is "some utilization of a facility in interstate commerce and it is not requisite that such use be substantial or integral to the operation of the illegal enterprise." *Id.* at 1299.

Appellants further rely upon *United States v. Yokley,* 542 F.2d 300 (6 Cir. 1976), where the court placed a restrictive construction upon the Hobbs Act, observing

that the government's interpretation of the statute "would encompass literally any armed robbery occurring in any state." *Id.* at 304. The approach of the court in *Yokley* however, was rejected in *United States v. Culbert,* 435 U.S. 371, 98 S.Ct. 1112, 55 L.Ed.2d 349 (1978), where the Supreme Court stated:

> With regard to the concern about disturbing the federal-state balance, moreover, there is no question that Congress intended to define as a federal crime conduct that it knew was punishable under state law. The legislative debates are replete with statements that the conduct punishable under the Hobbs Act was already punishable under state robbery and extortion statutes. * * *
>
> Our examination of the statutory language and the legislative history of the Hobbs Act impels us to the conclusion that Congress intended to make criminal all conduct within the reach of the statutory language.

*Id.* at 379–80, 98 S.Ct. at 1117. The fact that the present convictions may also constitute state criminal offenses is thus immaterial for our purposes provided that there was a sufficient nexus with interstate commerce to satisfy the Hobbs Act.

The appellants contend that Municipal Chemical was a "one-shot deal" and, accordingly, there was no effect on interstate commerce. In making this argument they rely primarily upon *United States v. Merolla,* 523 F.2d 51 (2 Cir. 1975), and *United States v. Elders,* 569 F.2d 1020 (7 Cir. 1978). In our opinion, however, the continuing nature of Municipal Chemical's activity and its use of material which necessarily traveled in interstate commerce is sufficient to distinguish the present case from those cited by appellants. Of further significance on this point is the fact that Municipal Chemical had no intention of ceasing operations following performance of the cleaning contract, and it was only when Spinnato's undercover activity had been revealed that it terminated its operations.

Santoni also challenges Count Four, contending that the government failed to offer any evidence of interstate transactions connected with the proposed demolition contract. In our opinion, however, Santoni's argument on this point is answered by our decision in *United States v. Spagnolo,* 546 F.2d 1117 (4 Cir. 1976) (per curiam), *cert. denied,* 433 U.S. 909, 97 S.Ct. 2974, 53 L.Ed.2d 1093 (1977), where we elected to place a broad construction upon the Hobbs Act, stating "all that is required to bring an extortion within the statute is proof of a reasonably probable effect on commerce, however, minimal, as a result of the extortion." *Id.* at 1119. The defendants in *Spagnolo* had forced the victim, under threat of physical harm, to execute a sale of his interest in a construction firm which received most of its materials through interstate commerce and, additionally, required him to pay to the defendants the sum of $1500. We noted that the withdrawal of the victim was reasonably calculated to reduce the funds necessary to purchase materials in interstate commerce, and that the defendants' conduct in forcing him to sell his interest in the firm satisfied the interstate commerce requirements.

■ In our opinion Santoni's conduct in extorting $10,000 from Municipal Chemical with respect to the demolition contracts parallels that of the defendants in *Spagnolo.* In each instance, interstate commerce was affected by the extortion of funds which otherwise might reasonably have been expected to be channeled into the purchase of material in interstate commerce.

## PROPERTY

Jakubik urges upon us that his conviction under Count Two cannot stand because "property" was not extorted within the meaning of the Hobbs Act. He argues that the property alleged to have been extorted was the subcontract, and that in the absence of benefit to the extortionist the Hobbs Act requires some loss to the victim; that since the subcontract was entered into for valuable consideration, there was no loss to Olympos Painting.

Extortion under the Hobbs Act does not require a direct benefit to the extortionist, *United States v. Green*, 350 U.S. 415, 420, 76 S.Ct. 522, 100 L.Ed. 494 (1956); "[t]he gravamen of the offense is loss to the victim," *United States v. Frazier*, 560 F.2d 884, 887 (8 Cir. 1977), and such loss includes intangible as well as tangible property. *United States v. Nadaline*, 471 F.2d 340, 344 (5 Cir. 1973), *cert. denied*, 411 U.S. 951, 93 S.Ct. 1924, 36 L.Ed.2d 414 (1973); *United States v. Tropiano*, 418 F.2d 1069, 1075–76 (2 Cir. 1969), *cert. denied*, 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530 (1970). In *Tropiano* the defendants were partners in a refuse removal company known as C & A. When Caron Refuse Removal, Inc., replaced C & A in servicing some of C & A's customers, the defendants by threats of violence forced Caron Refuse to cease further attempts to acquire C & A's customers and to consent not to solicit any more business in that area. The Second Circuit held that the property extorted was the right of Caron Refuse to solicit business free of territorial restrictions wrongfully imposed by its competitors. 418 F.2d at 1076. We agree with the government that here, as in *Tropiano*, the property extorted was the right of Olympos to make a business decision free from outside pressure wrongfully imposed, and this is sufficient to sustain the convictions on Count Two.

## PRE–TRIAL MOTION FOR SEVERANCE

Jakubik contends that under the standards set forth in Rule 8(b) of the Federal Rules of Criminal Procedure,[2] he and Santoni were improperly joined in the indictment. If the defendants were improperly joined under Rule 8(b), severance was, of course, mandatory and not a matter of discretion with the trial court. *United States v. Marionneaux*, 514 F.2d 1244, 1248 (5 Cir. 1975); *Ingram v. United States*, 272 F.2d 567, 569–70 (4 Cir. 1959); 8 Moore's Federal Practice ¶ 8.04[2] (2d ed. 1977). On the other hand, if joinder was proper the trial court was permitted to exercise its discretion in determining whether or not to proceed with a joint trial. *Ingram v. United States, supra*, at 569–70; see *United States v. Whitehead*, 539 F.2d 1023 (4 Cir. 1976). The test for joinder under Rule 8(b) is whether the defendants "are alleged to have participated in the same act or transaction or in the same series of acts or transactions." Where the defendants' acts are part of a series of acts or transactions, it is not necessary that each defendant be charged in each count, nor to show that each defendant participated in every act or transaction in the series. *United States v. Scott*, 413 F.2d 932, 934–35 (7 Cir. 1969), *cert. denied*, 396 U.S. 1006, 90 S.Ct. 560, 24 L.Ed.2d 498 (1970); 1 C. Wright, Federal Practice and Procedure § 144, at 324 (1969). Although "series of acts or transactions" is not defined in the Rule, such phrase logically includes those transactions so interconnected in time, place and manner as to constitute a common scheme or plan. *United States v. Jackson*, 183 U.S.App.D.C. 270, 277, 562 F.2d 789, 796 (1977); *United States v. Scott, supra*. The series of acts engaged in by Santoni and Jakubik constituted a scheme or plan of extortions through the wrongful use of fear of financial injury and under color of official right. Although Jakubik was not charged in Count Four relative to the demolition contract, it is clear that the charge under Count Four was part of the series of extortions involving the officers of Municipal Chemical and engaged in by Jakubik and Santoni. Count Five involved a charge against Santoni of tax evasion due to his failure to report the income extorted from Municipal Chemical. Thus it, too, was part of the series of acts engaged in by the defendants since such evasion was necessary to conceal the extor-

---

2. Fed.R.Crim.P. 8(b) provides:

 (b) Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transac-

tions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

tionate activity. Accordingly, joinder was proper, and the trial court did not err in proceeding with the joint trial of Santoni and Jakubik.

## RULE 14 MOTION FOR SEVERANCE

Near the end of their joint trial Santoni indicated for the first time that he would exercise his Fifth Amendment privilege not to testify. After being apprised of Santoni's intention, Jakubik moved for a severance pursuant to Rule 14 of the Federal Rules of Criminal Procedure.[3] Jakubik contends that he expected Santoni to testify in their joint trial because counsel for Santoni so indicated during his opening statement. Incident to his motion, Jakubik proffered that if he was granted a severance, Santoni would testify in Jakubik's separate trial that (1) Jakubik's involvement in the extortion was purely a political favor to Santoni; (2) Jakubik exaggerated his political importance; (3) Jakubik received none of the money which passed from Municipal Chemical to Santoni; (4) Jakubik never threatened anyone nor engaged in any effort to extort anything; and (5) Jakubik had no knowledge of the extortionate activity. Santoni's counsel agreed that Jakubik's proffer accurately reflected what Santoni would testify to in a separate trial.

The grant or denial of a motion for severance under Rule 14 lies within the sound discretion of the trial court and its action on such a motion will be overturned only when there has been a clear abuse of such discretion. *United States v. Gay,* 567 F.2d 916, 919 (9 Cir. 1978); *United States v. Jamar,* 561 F.2d 1103, 1106 (4 Cir. 1977). The trial court must weigh the inconvenience and expense to the government and witnesses of separate trials against the prejudice to the defendants inherent in a joint trial, and its determination will not be disturbed unless the denial of a severance deprives the movant a fair trial and results in a miscarriage of justice. *United States v. Walsh,* 544 F.2d 156, 160 (4 Cir. 1976), *cert. denied,* 429 U.S. 1093, 97 S.Ct. 1105, 51 L.Ed.2d 539 (1977); *United States v. Frazier,* 394 F.2d 258, 260 (4 Cir. 1968), *cert. denied,* 393 U.S. 984, 89 S.Ct. 457, 21 L.Ed.2d 445 (1968). The movant must show something more than merely a better chance of acquittal and "must overcome the burden imposed by a stringent standard of review." *United States v. Jamar, supra,* at 1106.

Jakubik relies principally upon our decision in *United States v. Shuford,* 454 F.2d 772 (4 Cir. 1971). In that case, however, the testimony of his codefendant was crucial to Shuford's defense and was unavailable from any other source. In holding that a severance should have been granted, we recognized the unique factual setting of the case, stating:

> We reach this conclusion, aware of the vital importance of Jordan's testimony to Shuford's defense, and in light of the substantial expectation that Jordan, if severance were granted, would indeed testify as indicated. We emphasize that our approach in this case does not mandate a severance in every situation where one defendant desires the testimony of another. We hold only, on the specific facts of this case, that Jordan's testimony took on unusual importance for Shuford's defense; that this testimony could become available only by severance; and that in these circumstances it was reversible error to deny Shuford's motion.
> (Footnote omitted).

*Id.* at 779. The factual setting which supported the motion in *Shuford* differs significantly from Jakubik's case for Santoni's proffered testimony lacks the degree of ex-

---

3. Fed.R.Crim.P. 14 provides:

 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

culpation which was present in *Shuford.* Testimony that Jakubik's involvement was purely political and that he exaggerated his political importance had no bearing upon the Hobbs Act violation, and the other items in the proffer were largely conclusory and had less than a pivotal bearing upon Jakubik's guilt or innocence. Under these circumstances, we cannot say that the trial court abused its discretion or that Jakubik was denied a fair trial by the denial of his motion.

The judgments of conviction are affirmed.

AFFIRMED.