UNITED STATES of America, Appellee,

v.

Larry Roger CHINCHIC, Appellant.

UNITED STATES of America, Appellee,

v.

Nick MELIA, Appellant.

Nos. 80–5172, 80–5173.

United States Court of Appeals,
Fourth Circuit.

Argued April 10, 1981.

Decided July 14, 1981.

John J. Burney, Jr., Wilmington, N.C. (Burney, Burney, Barefoot & Bain, Wilmington, N.C., on brief), for appellant in No. 80–5172.

Kathryn Emmett, Stamford, Conn., for appellant in No. 80–5173.

Wallace W. Dixon, Asst. U. S. Atty., Raleigh, N.C. (James L. Blackburn, U. S. Atty., Richard Tatum Gammon, Laura Lea Kranifeld, Third Year Law Students, Raleigh, N.C., on brief), for appellee.

Before WINTER, Chief Judge, BRYAN, Senior Circuit Judge, and ERVIN, Circuit Judge.

ERVIN, Circuit Judge:

Having before us for review the convictions of Larry Roger Chinchic (under 18 U.S.C. §§ 2314 and 2) and Nick Melia (under 18 U.S.C. § 2315), we reverse and remand for new trials for reasons set out below.

## I.

A. *History of the proceedings*

In March 1980, Larry Roger Chinchic, Alfred Anthony Conti, Nick Melia and others were charged in a three count indictment issued following an FBI investigation of certain burglaries that had taken place in Wilmington, North Carolina, in April and May 1977.[1] Chinchic and Conti were charged in the first count with interstate transportation of goods stolen from Gibson's Discount Center in Wilmington on or about April 7 and 8, 1977. Conti was charged in the second count with interstate transportation of goods stolen from Reed's Jewelry Store in Wilmington on or about May 14 and 15, 1977. Melia alone was charged in the third count of the indictment with receiving goods stolen from Reed's.[2]

The jury deadlocked at the first trial, and a mistrial was declared. At the second trial, Chinchic and Melia moved for severance based on misjoinder under Fed.R. Crim.P. 8(b), as well as on prejudice under Fed.R.Crim.P. 14; these motions were denied. In addition, Melia sought dismissal on the ground of double jeopardy, claiming that he had actually been acquitted at the first trial. This motion was denied as well. The double jeopardy contention arose out of an incident with the jury at the first trial. After the jury had deliberated several hours it reported from the jury room that it had reached a verdict on one defendant; it did not, however, identify the defendant nor did it indicate whether the verdict was of guilt or acquittal. The trial judge did not call the jury into the courtroom in order to record the verdict but ordered it to continue deliberating, and the jury subsequently reported that it was deadlocked on all three defendants. The parties stipulated that the jury had at first agreed to acquit Melia but that one juror had changed his or her mind, resulting in an ultimate deadlock of 11–1 for his acquittal.

1. Two of those charged in the first two counts of the indictment, Robert Eugene Mercier and Edmund Melvin Maras, were in the FBI's witness protection program at the time of the indictment, and their cases were handled separately from Chinchic's, Conti's and Melia's. Mercier and Maras testified for the government at the trial of this case. A third co-defendant, Leo Fraley, was missing at the time of trial and hence was not tried with the others.

Conti's appeal was submitted to this court on briefs and has been disposed of in a separate opinion. *See United States v. Conti,* 661 F.2d 927 (1981) (per curiam) (unpublished).

2. It was not stated on the face of the indictment that the goods which Melia was charged with receiving were from Reed's, but the evidence demonstrated that this was the theory of the government's case against him.

At the close of the government's evidence, the motions for severance and mistrial based on prejudicial joinders were renewed and again were denied. This second trial resulted in convictions on all counts.

## B. *Factual background*

The government's key witnesses at trial were Ed Maras and Robert Mercier, both of whom were charged in the first two counts of the indictment.

Maras testified that in the spring of 1977, he, Mercier, Conti, Chinchic and Leo Fraley traveled from Florida, where they were "after" a jewelry store, to Wilmington. The purpose of this trip was to look at stores to burglarize; among these were Reed's Jewelry Store and Gibson's Discount Center. Maras stated that

> the ones we looked at—a couple of them looked pretty good, and we was going to come back to them. But Gibson's—we figured we would get expense money out of there.

(Transcript at 75).

He testified that he, Mercier, Fraley and Conti returned to Wilmington approximately two months later to rob Reed's. At this point in Maras' testimony, Chinchic's request for a cautionary instruction was granted; the court advised the jury that the evidence concerning Reed's was not to be considered in Chinchic's case, because he was not named as being among those who had made the second trip.

Maras also testified that he and Fraley had gone to a house in Stamford, Connecticut, with the proceeds of the Reed's jewelry burglary. At this house, they met Melia, who introduced them to a doctor who agreed to purchase the jewelry.

Mercier testified that he, Conti, Chinchic, Maras and Fraley had made the April trip to Wilmington. This testimony was elicited concerning the purpose of the trip:

> MERCIER: That particular time, we came with really expressly one thing in mind—the Reed's—yeah, the Reed's and Gibson's. There were some questions that could not be resolved or felt could not be resolved on one—on the Reed's

store. And at that time, we had noticed the Gibson's store—

> MR. BLACKBURN: (interposing) By "we," who do you mean—everyone?
> MERCIER: Everyone. It was a mutual thing.
> THE COURT: Don't lead him, please.
> BY MR. BLACKBURN:
> Q. Well, by "we," who do you mean?
> MR. BURNEY: Objection.
> THE COURT: Overruled.
> THE WITNESS: Well, that, of course, would be myself, Mr. Conti, Mr. Chinchic, Mr. Maras, Mr. Fraley, Mr. Conti [sic]— the people that were involved.

(Transcript at 310–311).

Mercier testified that he, Conti, Fraley, and Maras returned to Wilmington to burglarize Reed's. He further testified that he had been to Melia's home four or five times for the purpose of disposing of merchandise from other robberies, and he described the home accurately.

Other testimony showed that the goods from the Gibson's burglary were taken to Conti's home in Youngstown, Ohio, and that the Reed's jewelry was taken to Youngstown before it was taken to Stamford, Connecticut.

The government also offered testimony from FBI Special Agent Milton Nix concerning conversations with Maras in which Maras discussed "his knowledge of burglaries and organized crime figures that worked in and around the Youngstown, Ohio area." (Transcript at 255). In addition, FBI agent Jay Fedderman described his meetings with Mercier.

## II.

■ At the outset, we reject Melia's contention that the government had no right to subject him to retrial after his "acquittal" at the first trial. We do so because we find that no valid verdict was taken by the court in accordance with Fed.R.Crim.P. 31(a), which requires that a verdict "be returned by the jury to the judge in open court." Votes taken in the jury room prior to being

returned in open court are merely preliminary and are not binding on the jury, any member of which is entitled to change his or her mind up until the time of the trial court's acceptance of the verdict. *See* Fed. R.Crim.P. 31(d) (if, upon a poll, there is not unanimous concurrence in verdict, jury may be directed to retire for further deliberations or may be discharged); *United States v. Love*, 597 F.2d 81 (6th Cir. 1979) (mere announcement of verdict by foreman not final verdict); *United States v. Taylor*, 507 F.2d 166, 168 (5th Cir. 1975) ("jury has not reached a valid verdict until deliberations are over, the result is announced in open court, and no dissent by a juror is registered"); *cf.* 5A J. Moore, Federal Practice § 49.07, at 49–48 (1980) (civil verdict not final until announced, received by court and recorded by clerk); *see generally* 2 C. Wright, Federal Practice and Procedure § 517, at 379 (1969).

Because the verdict was neither announced in open court nor accepted by the trial judge at the first trial, it was not a valid verdict of acquittal. Melia's retrial therefore did not constitute double jeopardy.

### III.

The next issue with which we are concerned is one of improper joinder under Fed.R.Crim.P. 8(b), which permits defendants to be jointly indicted

> if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Not contested in this case is that the second and third counts of the indictment were properly joined because they were part of the "same series of acts or transactions." Melia and Chinchic assert, however, that Rule 8(b) prohibits the government from trying the defendants in the first count (the Gibson's burglary) with the defendants in the second and third counts (the Reed's burglary). Because the two burglaries were separate and unrelated transactions, they contend, Chinchic (who was not connected with the Reed's burglary) was impermissibly joined with the defendants in the second and third counts, and Melia (who was not connected with the Gibson's burglary), was impermissibly joined with the defendants in the first count. The government, on the other hand, argues that the two burglaries constituted parts of a common scheme or plan and that joinder was therefore permissible.

■ Rule 8(b) provides the sole mechanism for joining criminal defendants for trial and by its terms allows joinder only when the crimes with which the defendants are charged are in some manner connected. The Fourth Circuit has recognized this limitation on joinder: in *Ingram v. United States*, 272 F.2d 567, 569 (1959), for example, the court noted that the rule

> provides that two or more defendants *may* be jointly charged if they are alleged to have participated in the same act or transaction. The necessary inference from this is that they *may not* be jointly indicted or tried in the absence of a common act or transaction. . . . [T]he joinder of defendants and offenses totally unconnected is prohibited by Rule 8(b). This is not a matter of discretion; both the statutory language and decided cases make this clear.

(emphasis in original).

■ Although Chinchic was among those who "looked at" Reed's during the first trip, nothing in the record indicates that Chinchic or any of the others intended to return to Wilmington at a later date to burglarize Reed's. Furthermore, nothing indicates that Chinchic took part in the planning or execution of the Reed's burglary. It was never suggested that Melia had taken part in or received goods from the Gibson's burglary. Therefore, because there is no evidence in the record connecting Chinchic with the Reed's burglary or Melia with the Gibson's burglary, our determination rests on whether the two burglaries were part of the same series of acts or transactions, that

is, whether they were connected or constituted a common plan or enterprise. If so, then it is unnecessary for Chinchic and Melia both to have been involved in or connected with each burglary. *See, e. g., United States v. Santoni,* 585 F.2d 667 (4th Cir. 1978), *cert. denied,* 440 U.S. 910, 99 S.Ct. 1221, 59 L.Ed.2d 459 (1979).

A review of the record in this case indicates that the two burglaries were separate and unrelated transactions. Although the government alleged a common scheme, it failed to offer any evidence in support of that theory. The evidence indicates that the Gibson's defendants "looked at" Reed's while they were in Wilmington for the Gibson's burglary; that evidence, however, was insufficient to show that the two burglaries were "so interconnected in time, place and manner [that they] constitute a common scheme or plan." *United States v. Santoni,* 585 F.2d at 673. At most, the government showed that there were two burglaries involving some of the same defendants. This circumstance, however, without a showing that the burglaries were in other manner connected, cannot operate as the basis for joinder of defendants. *See, e. g., United States v. Whitehead,* 539 F.2d 1023, 1026 (4th Cir. 1976) (joinder improper when both defendants participated in similar offenses with common third defendant, because government failed to prove connection between offenses); *United States v. Parson,* 452 F.2d 1007, 1008 (9th Cir. 1971) (joinder improper when defendant in one count charged with unconnected offense in which co-defendant not alleged to have participated); *see also* 1 C. Wright, Federal Practice and Procedure § 144, at 325–26 (1969).[3]

Having found nothing in the record to support the government's theory of a common scheme or plan, we accordingly conclude that the joinder was impermissible under Rule 8(b).

IV.

█ The question then arises whether the misjoinder entitles Chinchic and Melia to a new trial. The rule in this circuit is that misjoinder constitutes reversible error unless substantially all of the evidence adduced at the joint trial would be admissible at separate trials. *See United States v. Seidel,* 620 F.2d 1006 (4th Cir. 1980), *vacating in part on rehearing United States v. Kaplan,* 588 F.2d 71 (4th Cir. 1978). *See also United States v. Whitehead,* 539 F.2d 1023 (4th Cir. 1976); *Ingram v. United States,* 272 F.2d 567 (4th Cir. 1959). In *Seidel,* the court found that, although there was misjoinder of the two counts, the misjoinder was harmless error: even though Seidel was uninvolved with the second offense, evidence relating to it would have been admissible against him at a separate trial on the first count. The misjoinder therefore did not entitle him to reversal.

This case, however, is not that contemplated in *Seidel*: there is nothing in the record to indicate that, if separate trials were granted, the Reed's evidence would be admissible against Chinchic or the Gibson's evidence would be admissible against Melia for any reason. We therefore find that the misjoinder in the instant case warrants reversal of Chinchic's and Melia's convictions and we accordingly remand for new and separate trials.[4]

*REVERSED AND REMANDED.*

---

**3.** It is noteworthy although not conclusive that the government did not pursue a conspiracy theory here. In fact, the government's primary reason for seeking joinder appears to have been for the convenience of its witnesses, Maras and Mercier. At a hearing held prior to the first trial defendants' motions for severance, the government attorney advised the court:

> Your Honor [Maras and Mercier] are under the Witness Protection Plan. It was known to the U. S. Attorney's office at the time this indictment was drawn that they were. And your Honor, we knew that they would be

coming down and testify at trial. And that was the beginning basis of why all these counts were together.
(Mistrial Transcript at 11).

**4.** Chinchic and Melia also argue that even if the joinder were proper under Rule 8(b), they were entitled to severance under Rule 14. Because we find the joinder in this case to have been impermissible, we need not decide whether the trial court abused its discretion in denying severance under Rule 14 on the basis of prejudice caused by the joinder.

**552**

ALBERT V. BRYAN, Senior Circuit Judge, dissenting:

I would affirm. The joinder, in my view, was authorized under Fed.R.Crim.P. 8(b), since the defendants "participated ... in the same *series* of acts or transactions constituting an offense or offenses." (Accent added) This does not require each defendant's participation in each act: "Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count." *Id.*

Testimony, apparently believed by the jury, established a "series" sufficient for purposes of Rule 8(b). Maras and Mercier recounted that in the spring of 1977 they, with three other participants including Chinchic, traveled from Ohio to Florida "after" a jewelry store. On the return trip they passed through Wilmington, scouting for stores to burglarize.

As Maras put it, "[A] couple of them looked pretty good," but according to Mercier "[t]here were some questions that ... could not be resolved on one—on the Reed's store." The party therefore settled on Gibson's, burglarizing it to provide the expedition's "expense money."

However, this was not to be the last act of the series, for as Maras further testified "[W]e was going to come back to them [the other stores in Wilmington, including Reed's]." Scarcely more than one month later, according to Maras and Mercier, the same group except for Chinchic returned to Wilmington and burglarized Reed's. The similarity of the two crimes, their proximity in time, and the near-identity of the group carrying them out (indeed, although Chinchic was absent from the second expedition, his previous joint conduct with the perpetrators would have justified a charge of aiding and abetting) support the conclusion that they were constituents of the same "series of acts or transactions."

As to Melia, the demonstrated connection between the two burglaries settles adverse-

ly his claim of misjoinder as well. His alleged offense—facilitating the disposition of the Reed's proceeds—was unquestionably part of the same "series" as the Reed's incident, which in turn was linked in a single chain with the Gibson's break-in.

I would affirm the District Court's judgments of conviction.

In light of our disposition of this case under Rule 8(b), we need not address the remaining errors that Chinchic and Melia assert occurred at trial.