998 F.2d 1011
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Oscar SICLE, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
Carlos ALberto Urrego, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
Rafael Diaz, a/k/a Ralph, Defendant-Appellant.
 Nos. 92-5365, 92-5378, 92-5379.
 United States Court of Appeals,
Fourth Circuit.
 Argued: April 1, 1993.
Decided: July 26, 1993.
 
 Appeals from the United States District Court for the Middle District of North Carolina, at Greensboro.
 Benedict P. Kuehne, SONNETT, SALE & KUEHNE, P.A., for Appellant Sicle.
 Gregory C. Denaro, GREGORY C. DENARO, P.A., for Appellants Diaz and Urrego.
 David Bernard Smith, Assistant United States Attorney/Senior Litigation Counsel, for Appellee.
 Robert H. Edmunds, Jr., United States Attorney, for Appellee.
 M.D.N.C.
 AFFIRMED.
 Before WIDENER, Circuit Judge, CHAPMAN, Senior Circuit Judge, and FABER, United States District Judge for the Southern District of West Virginia, sitting by designation.
 PER CURIAM:
 
 OPINION
 
 1
 Appellants Oscar Sicle, Raphael Diaz and Carlos Urrego, together with ten others, were indicted for conspiracy to possess with intent to distribute kilogram quantities of cocaine and distributing kilogram quantities of cocaine in violation of Title 21, U.S.C. §§ 864 and 841(b)(1)(A). There were also certain substantive counts of possession and distribution of cocaine contained in the indictment, but such counts are not relevant to the issues now on appeal. The district court severed the indictment into three trials with Sicle, Diaz and Urrego being joined as defendants in one trial. These appellants were residents of Miami, Florida, and their trial was conducted in the Middle District of North Carolina, because the indictment charged that the conspiracy, during a period beginning April 1986 and continuing until July 27, 1990, operated in the Middle District of North Carolina, the Eastern District of North Carolina, the Southern District of Florida, and elsewhere. Appellants claim errors in their trials because (1) the trial court failed to grant a severance motion of Diaz and Urrego; (2) the trial court failed to grant a motion of acquittal after the government proved multiple conspiracies but alleged only a single conspiracy in the indictment; (3) the trial court failed to dismiss the indictment or grant a motion of acquittal on the ground that the government had not presented sufficient evidence to the grand jury; (4) the evidence was not sufficient to support the conspiracy convictions; (5) the evidence did not establish venue in the Middle District of North Carolina; (6) the appellants were prejudiced by the perjured testimony of a key prosecution witness; (7) the trial court erred in restricting the cross examination of the perjured witness; (8) the trial court should have granted a motion for a curative instruction or a mistrial when witness Larttey testified to criminal acts by Diaz which occurred prior to the period of the conspiracy alleged in the indictment; and (9) the trial court refused to charge the jury on the appellants' theory of their defense.
 
 
 2
 We find no reversible error in the trial, and we affirm.
 
 I.
 
 3
 The prosecution was built upon the testimony of Sahm Manko, a native of Ghana, West Africa. Manko came to the United States about 1980, and he was the central figure in the conspiracy charged in the indictment. After his arrest on July 27, 1990, Manko began to cooperate with the DEA. Maxwell Larttey, Manko's cousin, and Lynn Peugot, were both members of the cocaine conspiracy and also cooperated with the DEA and testified for the government. The prosecution's evidence, viewed in the light most favorable to the government, established that when Manko moved to the United States he lived for a short time in Massachusetts with Larttey. In 1982, Manko moved to Miami and was employed by a pest control company where he met the appellant Raphael Diaz. After suffering a work related injury which disabled him for a short time, Manko left the pest control company and entered the cocaine distribution business. He also maintained a car wash, and later operated a fish market, an African artifacts shop, and finally a clothing store. By 1988, the DEA began to investigate Manko as a suspected drug dealer. A pen register was placed on his telephone, a wiretap monitored his telephone and his organization was infiltrated by the DEA. Hector Lopez, who had supplied Manko with cocaine from 1986 to 1988, became a confidential informant following his arrest. Thereafter, Manko obtained cocaine from Hyme Lopez Omar and Jesus Hector Valiz. In 1989, he also used Gilberto Santiesteban as a cocaine source. At his first debriefing with DEA, Manko did not mention Lopez, Omar, Valiz or Santiesteban as cocaine sources, but he did name Diaz as a supplier of cocaine in 10 kilogram quantities. Over the course of several months and in extended debriefing sessions, Manko identified Diaz, Sicle and Urrego as suppliers of cocaine.
 
 
 4
 At trial Manko testified that during 1986-1988, his suppliers of cocaine were appellants Diaz and Sicle, and also Hector Lopez. He stated that Diaz required payment in full at the time of delivery but that Sicle would front one-half of the price, that is, he required one-half of the price at the time of delivery and the remainder after Manko had sold the drugs. The cocaine Manko obtained from the appellants was distributed in North Carolina, New York, the District of Columbia, and Connecticut. In late 1987 or early 1988, Manko made his first trip to North Carolina with Robert Daniels and sold one kilogram of cocaine to Frank Mills. On a second trip to North Carolina, Manko distributed two kilograms of cocaine received from defendant Diaz. Manko identified his major North Carolina customers, who were named as original defendants in the indictment and tried separately from the present appellants.
 
 
 5
 In February 1989, Manko and Peugot received 10 kilograms of cocaine from Sicle, and this cocaine was taken to North Carolina by Manko and Larttey and distributed to Charlie Mack and Glen Mark. The following month, Manko and Peugot received eight kilograms of cocaine from Sicle, but Glen Mark refused to buy it because of the quality. Manko and Peugot obtained four kilograms of better quality cocaine from Diaz and delivered it to Mark to be mixed with the poor quality cocaine previously offered.
 
 
 6
 In June 1989, Manko and Peugot delivered $127,000 to Sicle and Larzaro for ten kilograms of cocaine, which was never delivered. Thereafter, Manko obtained cocaine from Diaz.
 
 
 7
 In July 1989, Manko and Urrego, who was operating a business next door to Manko's clothing store, discussed the $127,000 debt owed by Sicle and this discussion led to a cocaine relationship between Manko and Urrego. Shortly thereafter, Urrego delivered two kilograms of cocaine to Manko. This was taken to North Carolina by Larttey and delivered to Charlie Williams for distribution. Payment for this cocaine was made in Winston-Salem. Between August and October 1989 there were other multi-kilogram transactions between Manko and Urrego, and these drugs were distributed in North Carolina to Mark Burns in Greensboro and Charlie Williams in Winston-Salem.
 
 
 8
 In his testimony, Manko identified codes he used with various defendants in discussing cocaine business and produced a copy of his phone book and identified telephone numbers for the three appellants. The telephone records showed numerous calls by Manko to the numbers of the appellants.
 
 
 9
 Maxwell Larttey testified about his various trips to North Carolina with Manko and the distribution of this cocaine through Glen Mark and Charlie Williams in Winston-Salem. Larttey had become involved in Manko's organization in 1984 and made frequent trips from Miami to Boston to obtain and distribute multi-ounce quantities of cocaine. Larttey also testified about multi-kilogram quantities of cocaine received from Sicle and from Urrego and the transportation to North Carolina for distribution. After Larttey moved to Miami, he saw Diaz at Manko's residence when multi-kilogram quantities of cocaine were delivered. Larttey also discussed with Sicle the problem of the $127,000 Sicle owed Manko, and Sicle stated that he was going to sell a Porsche automobile and pay Manko. The witness Peugot also testified as to a discussion with Sicle about the sale of the Porsche and the payment of the debt.
 
 
 10
 Lynn Peugot testified that in February 1989, she accompanied Manko to Sicle's business, the European Connection, with a large sum of money and that Manko received ten kilograms of cocaine from Sicle which was later transported to North Carolina. In December 1989, she was present with Manko when he took a sum of money to Diaz' residence and received four kilograms of cocaine for transportation to North Carolina. During the summer of 1989, Peugot met appellant Urrego, who opened a business, Gala Expressions, next door to Manko's shop. She overheard a conversation between Manko and Urrego in the summer of 1989 concerning a ten kilogram drug transaction. She observed Manko leave his shop with a briefcase containing $40,000, go to Urrego's business and return with two kilograms of cocaine which was transported to North Carolina for distribution. She also testified about trips she made to North Carolina for the purpose of picking up money from Manko and returning it to Miami. She also testified about the $127,000 delivered by Manko to Sicle and the efforts of Manko to get the money returned. Her testimony also included a meeting with Sicle which was recorded. She testified about a conversation she had with Urrego concerning a $2,000 shortage from a two kilogram cocaine transaction.
 
 
 11
 At the conclusion of the government's case, the defendants moved for judgment of acquittal and to dismiss. They argued that multiple conspiracies had been proven at trial and that the government had failed to prove venue in the Middle District of North Carolina. These motions were denied and the defendants Urrego and Diaz offered evidence. The trial court denied the supplemental jury requests offered by the government and the defendant Sicle. The defendants were convicted of conspiracy and they appeal.
 
 II.
 
 12
 Appellants argued that they should have been granted a severance and tried separately because the indictment charged a single conspiracy, but at trial the government proved multiple conspiracies. This alleged variance between the proof and the indictment was also presented as a ground for their motion of acquittal. Appellants contend that the evidence presented by the prosecution showed that Diaz, Sicle and Urrego were not connected, but were independent suppliers of cocaine to Manko. They argue that their sales took place in Miami, and they were never involved in any action that occurred in the Middle District of North Carolina. They claim they were actually competitors in supplying cocaine to Manko, who chose his suppliers, including the defendants, based upon price, quality and terms of payment; therefore, Manko had a separate relationship with each appellant resulting in three separate conspiracies rather than the one charged.
 
 
 13
 The issue of severance is committed to the discretion of the trial judge, Opper v. United States, 348 U.S. 84, 95 (1954), and his decision will not be disturbed except upon a clear showing of abuse of discretion resulting in prejudice. United States v. Frazier, 394 F.2d 258, 260 (4th Cir.), cert. denied, 393 U.S. 984 (1968). One seeking a severance must show more than that he would have a better chance of acquittal in a separate trial. United States v. Roberts, 881 F.2d 95, 102 (4th Cir. 1989).
 
 
 14
 In a conspiracy case, a defendant's liability is not determined by the extent of his involvement, nor is it necessary that he have specific knowledge of the identity or the exact role of the other conspirators. United States v. Burman, 584 F.2d 1354, 1357 (4th Cir.), cert. denied, 439 U.S. 1118 (1978). If one knowingly joins an existing conspiracy, he is equally liable for the acts and declarations of co-conspirators, even though such acts were done prior to his entry into the conspiracy. United States v. United States Gypsum Co., 333 U.S. 364, 388 (1948).
 
 
 15
 The evidence established that appellants committed acts in furtherance of the conspiracy charged in Count 1 of the indictment. Each of them sold cocaine to Manko with the knowledge that the illegal drugs were being transported to North Carolina for distribution. Each appellant participated in the conspiracy, and they are equally responsible under the law for the acts of co-conspirators in furtherance of the conspiracy. Therefore, a joint trial was appropriate because it was not required that each defendant participate in or have knowledge of every act committed in furtherance of the enterprise. United States v. Santoni, 585 F.2d 667 (4th Cir.), cert. denied, 440 U.S. 910 (1978).
 
 
 16
 Appellants Diaz and Urrego claim that they should have been tried separately because they were prejudiced by a taped conversation between Lynn Peugot and appellant Sicle. At the time of this conversation, Peugot was wearing a body tape recorder supplied by the DEA. She went to Sicle's place of business and specifically asked him about the $127,000 that he owed Manko for the drugs that were not delivered after the money was paid. The court gave a very clear limiting instruction to the jury that the tape and any testimony of Peugot about her conversation with Sicle after the end of the conspiracy could only be considered as to the defendant Sicle and not as to defendants Diaz and Urrego. This instruction was sufficient to prevent any prejudice to Diaz and Urrego, and there was no error by the trial court in failing to sever on this ground.
 
 III.
 
 17
 Appellants argue that the government in effect amended the indictment, which charged only a single conspiracy, by its evidence which established multiple conspiracies, and this is a fatal variance which caused irreparable damage to the appellants in violation of their due process rights under Stirone v. United States, 361 U.S. 212, 215-217 (1960). There was not a variance between the conspiracy charged in the indictment and the evidence presented at trial. Constructive amendment of an indictment occurs when the presentation of evidence and the jury instructions change the elements of the offense charged in the indictment and the defendant is convicted of a crime other than that originally charged. United States v. Schnabel, 939 F.2d 197, 203 (4th Cir. 1991).
 
 
 18
 In considering whether the proof established one conspiracy or several, it is necessary to focus on the entire enterprise and its purpose, which was to distribute cocaine. Certain persons were involved in the actual distribution in the Middle District of North Carolina i.e. Burns, Marks, Hicks, Mills, Oakley, et al; the appellants were the suppliers of the cocaine and Manko, Peugot and Larttey were the operators in the center connecting the suppliers with the ultimate distributors. They were all involved in the same undertaking, which was to obtain cocaine and distribute it at a profit.
 
 
 19
 A variance between the indictment and the proof is disregarded unless it affects substantial rights. Rule 52 Federal Rules of Criminal Procedure. A variance claim in a conspiracy case is a challenge to the sufficiency of evidence supporting the jury's finding that each defendant was a member of the same conspiracy. This raises a question of fact which is for the jury. The fact that the government's evidence might also be consistent with an alternate theory is irrelevant; the law does not require the government to disprove every conceivable hypothesis of innocence in order to sustain a conviction on an indictment proved beyond a reasonable doubt. United States v. Beverly, 913 F.2d 337 (7th Cir. 1990).
 
 
 20
 Even if the evidence arguably establishes multiple conspiracies, there is no material variance from an indictment charging a single conspiracy if a reasonable trier of fact could have found beyond a reasonable doubt the existence of the single conspiracy charged in the indictment.
 
 
 21
 United States v. Champion, 813 F.2d 1154, 1166 (11th Cir. 1987). Appellants urge our adoption of the reasoning of United States v. Townsend, 924 F.2d 1385 (7th Cir. 1991), which held that a drug buyer-seller relationship, standing alone, would not support a conspiracy conviction, and that all purchasers from a common drug source do not become co-conspirators, because they may actually be competitors in the resale of the drug. They also ask that we follow the Tenth Circuit holding in United States v. Harrison, 942 F.2d 751 (10th Cir. 1991), that competing parallel drug suppliers are not co-conspirators unless there is a showing of an interdependence and community of interest among said suppliers.
 
 
 22
 We prefer the reasoning we expressed in United States v. Burman, 584 F.2d 1354, 1356 (4th Cir. 1978). Although Burman dealt with buyers of heroin, the reasoning is equally applicable to suppliers of cocaine. In Burman we concluded that each buyer was a part of a larger conspiracy because "from the nature of the contraband and the vastness and regularity of their own dealings, each reasonably knew that smuggling and various other illegal transactions were required to make their own dealings possible." 584 F.2d at 1356. In United States v. Edwards, 945 F.2d 1387, 1393 (7th Cir. 1991), cert. denied, 475 U.S. 673 (1992), the court found:
 
 
 23
 Where competing suppliers maintain a long standing business relationship with the network, it makes no sense to exclude them from the web of expanded drug conspiracy liability. These long-standing suppliers become as much a part of the conspiracy as the core managers, and thus should be sentenced on the basis of the entire quantity of drugs distributed by the network. In sum, the more important consideration is not whether a particular defendant can be labeled a competitor of other defendants, but instead is whether the defendant demonstrated a substantial level of commitment to the conspiracy, either by engaging in a consistent series of smaller transactions throughout the life of the conspiracy, or by engaging in one substantial transaction (such as loaning a large amount of money to the network).
 
 
 24
 The evidence clearly established that each of the appellants was engaged in and knew he was a part of a large enterprise that was selling and distributing multi-kilogram quantities of cocaine that the appellants were supplying on a regular basis and over a substantial period of time. Their activities were indispensable to the operation and success of the overall conspiracy, and the evidence was sufficient to sustain a jury finding of a single conspiracy.
 
 IV.
 
 25
 We find no merit to appellants' argument that the evidence was not sufficient to convict them of conspiracy under Count 1 of the indictment. Under Glasser v. United States, 315 U.S. 60, 80 (1942), a verdict of guilty is sustained on appeal if it is supported by substantial evidence, taking the view of said evidence that is most favorable to the government. The question becomes whether under such a view any rational fact-finder could have found that the essential elements of the charge have been proved beyond a reasonable doubt. Jackson v. The Commonwealth of Virginia, 443 U.S. 307 (1979).
 
 
 26
 The essential elements of a conspiracy to violate Title 21 U.S.C. §§ 841 and 846 are (1) an agreement between two or more persons to violate the laws of the United States relating to controlled substances, and (2) appellant's willful joinder in that agreement or undertaking. United States v. Clark, 928 F.2d 639, 641-42 (4th Cir.), cert. denied, U.S., 112 S.Ct. 1701 (1991).
 
 
 27
 The evidence is overwhelming that each appellant provided multikilogram quantities of cocaine to the Manko drug distribution organization during the period of the conspiracy's existence as alleged in the indictment for distribution in the Middle District of North Carolina. The vastness of the organization, the amount supplied by each appellant and the regularity of their dealings with the conspiracy were sufficient to support the jury's finding of guilty as to each appellant.
 
 V.
 
 28
 We find no merit to appellants' argument that venue in the Middle District of North Carolina was not established. A conspiracy may be prosecuted in any district in which the offense is begun, continued or completed, United States v. Martinez, 901 F.2d 374, 376 (4th Cir. 1990), and the evidence clearly established that multi-kilogram quantities of cocaine were provided by the appellants to the organization and large quantities of this cocaine were distributed in Greensboro and Winston-Salem, North Carolina, which are in the Middle District. The evidence was also sufficient for the jury to find that these appellants knew that their product was finding its way into the Middle District of North Carolina.
 
 VI.
 
 29
 During cross-examination of government witness Maxwell Larttey, a controversy arose concerning certain notes used by the witness to refresh his memory as to dates, places and people involved in certain drug transactions. There were disputes as to whether the notes were the originals, when they were made, who made them, and who furnished the information. After lengthy argument and voir dire of the witness with the jury out of the courtroom, the witness admitted that certain information he gave about the origin of the notes was false. Defense counsel moved for a dismissal based upon Larttey's admitted perjury. This motion was denied and the court allowed extensive cross-examination of the witness in the presence of the jury. During this cross-examination, it was clearly brought out that Larttey's original testimony as to the original note and the author thereof was false. The witness's veracity was aggressively attacked by defense counsel and we find no error in the trial court's refusal to dismiss the case or grant the motions for acquittal based upon Larttey's original false testimony about the origin of the notes. This problem was handled in such a way that the jury was completely aware of the witness's false testimony, and the jury could weigh this information in deciding whether to believe any of his testimony.
 
 
 30
 The trial court has broad discretion in its handling of the examination and cross-examination of witnesses. We find no error by the trial judge in sustaining an objection to one question propounded to the witness Larttey which asked if he were under investigation for prosecution of perjury or obstruction of justice. This question related to his admitted untruthful testimony on direct examination about the origin of the note and this matter had been fully aired before the jury. Larttey's credibility had been severely impeached, he admitted to certain false testimony, and it was time to move the trial along to other issues.
 
 VII.
 
 31
 We find no error in the trial court's denial of appellant Diaz's motion for a curative instruction or mistrial because the testimony by Larttey about a visit to Diaz's residence with Manko on a date prior to the date alleged in the indictment as the beginning of the conspiracy. In the court's final instructions to the jury, he clearly advised that the defendant was on trial only for acts and offenses alleged in the indictment and not for conduct not alleged. This was sufficient under the circumstances.
 
 VIII.
 
 32
 We also find no error in the trial court's refusal to give appellant Sicle's request for Jury Instruction No. 29 which sets forth his theory of defense. This request stated that Sicle was engaged in a legitimate automobile repair business and had never agreed with Manko to engage in any drug conspiracy, and that the witnesses Manko, Larttey and Peugot testified falsely against him. We have clearly held that a trial court is not required to instruct the jury on a theory of defense which is not supported by the testimony of the defendant adduced at trial. See United States v. Williams, 604 F.2d 277, 281 (4th Cir.), cert. denied, 444 U.S. 967 (1979).
 
 
 33
 Sicle's requested Jury Instruction No. 29 was argumentative and better suited for his counsel's closing argument. In its charge, the court adequately explained the law upon which Sicle's defense rested, and the rejection of his Request No. 29 was not error.
 
 IX.
 
 34
 We find no merit to applicants' claim that the trial court erred in not dismissing the indictment because of their claim that the evidence presented to the grand jury mentioned them only as some of Manko's Florida cocaine suppliers and did not connect them to the North Carolina distribution conspiracy, so there was no probable cause to support the grand jury's return of a true bill on the indictment. This claim is laid to rest by United States v. Mechanik, 475 U.S. 66, 67 (1986): "We believe that the petit jury's verdict of guilty beyond a reasonable doubt demonstrate a fortiori that there was probable cause to charge the defendants with the offenses for which they were convicted." See also Costello v. United States, 350 U.S. 359 (1956).
 
 
 35
 For the reasons stated above, we find no reversible error in any of the convictions and the judgments of conviction are affirmed.
 
 AFFIRMED